[No. 30893. *En Banc.* April 3, 1950.]

THE STATE OF WASHINGTON, *Respondent,* v. RALPH LINTON, *Appellant.*[1]

[1]Reported in 216 P. (2d) 761.

*Robertson & Smith* and *George N. Apostol,* for appellant.

*John Hancock,* for respondent.

ROBINSON, J.—This is an appeal from a conviction on a two-count information.

Count I was based upon Rem. Rev. Stat., § 2436, and charged the defendant with carnally knowing and abusing a female child under the age of eighteen years, to wit, of the age of seventeen years, not then his wife.

Count II read as follows:

"And the Prosecuting Attorney aforesaid charges the defendant Ralph Linton, in Count II of this amended Information and as a part of the same act and transaction as set out in Count I of this Amended Information and connected therewith, with the crime of assault in the second degree, committed as follows, to-wit:

"That he, the said Ralph Linton, in the County of Okanogan, State of Washington, on or about the 10th day of August, 1948, willfully and unlawfully did make an assault upon one _____, a female child under the age of 18 years, not the wife of said defendant, with intent then and there to commit a felony, to-wit: The crime of carnal knowledge upon the person of said _____, and said Ralph Linton did willfully and unlawfully inflict grievous bodily harm upon the person of said _____ _____, a human being, by then and there striking and

hitting the said ........................................ with his hands and fists, all contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Washington."

We will not fully set out the evidence in the case. We may say, however, that it would have sustained a verdict of guilty if the defendant had been charged under § 2435 of the code, since it sufficiently established that the complaining witness made a most vigorous resistance, which was forcibly overcome.

However, some quotation from the evidence is necessary to establish a background for discussion of certain questions raised by the appellant's assignments of error.

It was charged that the alleged crime was committed on August 10, 1948. The complaining witness testified that, having been born on February 3, 1931, she was seventeen years and about six months old at the time of the alleged assault. That she was born on February 3, 1931, was corroborated by the introduction of state's exhibit No. 1, a certified copy of the registry of births of the county of Roseau, state of Minnesota. She further testified that, on the evening of August 10, 1948, she went to the bus depot at Omak, Washington, to meet her brother, and, finding that the bus on which he was expected to arrive would be an hour late, decided to go to the home of a girl friend, rather than to wait at the station; and that, while she was en route to her girl friend's house, the defendant, Linton, in an automobile, pulled over to the curb and called her name, and she went over to the car.

"Q. You say by the Chevrolet garage Mr. Linton pulled over to the curb and called your name. . . . A. He asked me what I was doing and I told him I was waiting for the bus for my little brother and he asked me to ride around for awhile until it was time for the bus. Q. And did you ride with him after he asked you to? A. Yes. Q. Just go ahead and tell us where you went with him and what occurred and what happened. A. Well, we came down to Okanogan and he offered me a drink of whiskey and I told him 'No', and when we got to Okanogan he asked me if I would like a bottle of beer and I said I might drink one and

he went to a tavern and got about six bottles of beer and he opened two bottles and I drank one and he drove out across the bridge to the reservation. I thought he was taking the river road to Omak. He took off on a side road up there."

This side road, locally called the "corkscrew grade," is a lonely and little traveled road leading into the Colville Indian Reservation. The complaining witness further testified that, after driving up this road for a little distance, defendant made a U-turn and parked the car, headed in the direction from which they had come.

According to her further explicit testimony, the defendant then removed portions of her clothing and consummated the act which constituted carnal knowledge, as defined in Rem. Rev. Stat., § 2437.

The complaining witness further testified:

"Q. You stated that you saw the lights of a car coming. About how far away was the car, do you know, at the time that you first saw the lights? A. I don't know how far it was away. Q. Did this car stop or go by the car in which you were with Linton at that time? A. They stopped a little ways past and then backed up. Q. Did you endeavor to make any scream or try to holler to attract their attention? A. Yes. Q. Did you make any noise or holler? A. Yes, I screamed. Q. What did the defendant Linton do at the time you screamed and the car backed up? A. He put his hand over my mouth and I bit him and he took it away and I screamed again and he got out of the car and ran around to the other side and I got out and took my clothes and went to the other car. Q. What do you mean by your clothes? A. My jeans and panties. Q. And where were the jeans and pants that you picked up at that time? A. They were at the end of the seat. Q. That is the end where your feet were? A. Yes."

In giving his version of the matter, the defendant, Linton, as would be expected, denied a great deal of the testimony given by the prosecuting witness. For example, while she testified that he called to her from his car and she went over to him and he asked her if she would like to take a drive with him, he testified that she came over to his car and asked him to take her to Okanogan. She testified that, after

she got into the car, he produced a bottle of whiskey, which she refused. He testified that she took two drinks of whiskey on the drive from Omak to Okanogan.

In addition to a transcription of Linton's testimony given at the trial, we have an exhibit, called a statement, which opens with the following:

"I, Ralph Linton, make the following statement and confession of my own free will and accord, without threat of any kind being made to me or without any promise of immunity being made to me."

We quote the following excerpts from the body of the instrument:

"While I was sitting in my car near the bus depot, a girl, whom I have been informed was [naming the prosecuting witness], came up to my car and wanted to know if I would take her to Okanogan. When she got in the car she said she wanted a drink and I gave her some drinks. When we got to Okanogan I bought six bottles of beer and drove out on the reservation with her. We did some drinking in the car, and I wrestled around with her in the car and kissed her a time or two. . . . She got out of the car and said she was going to urinate. About that time I saw a car coming and she started to get back into the car and had her jeans pulled part-way up. When the car came alongside of my car, she screamed and hollered for help and got out and ran over to the car and got in it. . . .

"There wasn't any fight or struggle in the car, and the scratches which I have on my body are scratches that I acquired while moving an old barn at Brewster. The girl didn't scratch me or try to hit me with anything while she was in the car and there was no fight or struggle. There was no blood on the seat of my car yesterday, and the blood that is there now must have been caused by her being sick."

The statement closes as follows:

"I have read the above and foregoing statement, and the statements contained therein are true.

"Dated at Okanogan, Washington, this 11th day of August, 1948. [Signed]. Ralph Linton
Witnesses:
 Lester H. Moss
 John Hancock"

The complaining witness testified that, at or about the time, or immediately after, the defendant accomplished his purpose, she saw the lights of an approaching car and began screaming; whereupon the defendant got out of the car and pulled up his trousers, and she got out of the car and grabbed her jeans and panties, and ran over to the approaching car to ask for help. That she did so scream and run over to the car was admitted by the appellant. However, he testified that, at that time, her jeans and panties were pulled up above her knees, which was consistent with his other testimony that she had left the car to answer a call of nature. Testimony of the complaining witness that she was carrying her jeans and panties was corroborated by the occupants of that car.

Charles Hassenphlug and wife testified that they lived on a farm about eighteen miles from Okanogan on the Indian reservation, and on August 10, 1948, that date being fixed in their minds because August 10th was Hassenphlug's birthday, they drove up the "corkscrew grade" about eleven p. m., en route home after having had a birthday dinner with their children in Okanogan. Mr. Hassenphlug testified that, as they rounded a curve coming up the grade, they saw a car ahead of them, parked alongside the road. As appellant contends that a great deal of his testimony was inadmissible, we find it necessary to quote a considerable portion thereof.

"A. All at once we noticed the right door was swinging back and forth and Mamma says, 'There must be some trouble.' I decided maybe it was just a party of some kind and was going to go on and just as we got on by we heard some sort of scream and so I stopped, and Mamma says, 'There is somebody in that car hurt.' There was a piece of floor mat hanging there and she thought there was somebody underneath the car so I stopped. At that time she took the flashlight and about that time we heard another party scream and I started to back up and I called, 'What is the matter back there?' About that time this girl came out hollering and crying, and of course, I just got a glimpse of her. She came through the light of the flashlight and she had no clothes from her waist down, and I didn't get to see

the man at all, only a profile. He was in the car and he drove off. She got into our car crying and hollering and I had to drive up the road a ways to turn around. When we went up to turn around and came back he was gone. I saw his light. He took off on the Omache Lake road right for Omak and we turned and came to Okanogan. She didn't know where she was because after we got over here and hit the bridge she said, 'I thought you were going to take me home.' She thought perhaps we were taking her home. MR. MANSFIELD: We object to that. THE COURT: That part of the answer will be stricken and the jury instructed to disregard it. A. (Continuing) She did say that to me and when we got to the postoffice she said again, 'Aren't you taking me to Omak?' and I said, 'No, I am taking you up to the night cop.' Q. What was the physical condition of that girl? A. She was hollering and crying like she was crazy. I had to tell her she would have to quit or I would have to slap her while we were turning around because I thought she was going to pass out on us. Q. I will ask you whether or not she appeared to have been struggling or was exhausted. A. Oh, yes. MR. MANSFIELD: Object to that. THE COURT: Objection sustained. MR. HANCOCK: Just go ahead and tell us what her complete physical condition and appearance was when she got over to your car. A. She had no clothes, as I say, to her waist and I didn't know she had even put them on. She got in the car; she didn't ask no questions because she couldn't talk; she was hollering and crying. MR. MANSFIELD: I move the portion 'she couldn't talk' be stricken. THE COURT: Motion denied. A. She got in the car and I had to turn around. In the meantime she put on her clothes but I didn't know it. When we got started back she was complaining of her jaw where she got hit in the jaw. MR. MANSFIELD: I move that be stricken and move that the witness' remarks be limited to what he saw. He may not testify, under the rules, as to what she said. THE COURT: What portion are you moving be stricken? MR. MANSFIELD: That portion of the answer in which the witness said she was complaining of her jaw. MR. HANCOCK: I believe he can testify to that. MR. MANSFIELD: Not at all under the general rule. THE COURT: The portion that counsel has moved to be stricken will be denied. The portion of the answer of the witness quoting statements made by this complaining witness will be stricken and the jury instructed to disregard it. He may testify as to what he saw and the condition of the girl at the time. MR. HANCOCK: Q. I will ask you whether or

not you observed or noticed any marks of any kind on this girl at this time? A. Not out there. Not until we got in here and I took her out of the car. Q. Go ahead and relate to the jury and tell them everything that you noticed or observed and saw about the girl at that time, from the time out there until you got her into town. A. When she got into the car I couldn't see her because I was driving and I didn't get a look at the girl until I got her here in town and turned her over to the cop, and I know then she had a big jaw. Q. What do you mean by 'a big jaw'? A. Her face was swelled. Q. Did she have clothing on from her waist up at the time she got into the car? A. Yes. Q. There was nothing below?"

On re-direct examination, Mr. Hassenphlug further testified as follows:

"Q. You stated that as you approached the car, or shortly after you got past the car, you heard a noise. Can you describe and tell us the nature of that noise? A. It sounded a great deal like somebody that was trying to holler and couldn't holler. Mr. Mansfield: I think that comes within the objection. The Court: The objection is overruled. Mr. Mansfield: Exception. Mr. Hancock: Q. Did you at any time hear any distinct screams of any person before the girl got into your car? A. Oh, yes. Right after I called back there then there was really a scream come out. Q. Was there a difference between the sound of the screams that were coming from that car after you called out and those that were coming from the car prior to the time that you backed up and hollered? A. Oh, yes. She really came out there screaming and crying then."

He testified, on further cross-examination:

"By Mr. Mansfield: Q. These subsequent screams came after she got out of the car, didn't they? A. Not before she got out—just as she come out. Q. She was out in the road, wasn't she? A. Just as she come out. Q. Was the door opened before she come out? A. The door was opened, yes. Q. Could you see her? A. I got a glance through the flashlight and the car door was open. It had to be when she come out. Q. You saw her come out of the other car? A. That is right. Q. Did you see Mr. Linton standing there in the road? A. No, I didn't. Q. In fact, you testified that he was in his own car? A. That is right. Q. And had her clothes in her hands? A. That is right. . . . Q. When she got in the

car she asked you to take her home, didn't she? A. No, she didn't. Q. When you got down towards the bridge was when she said, 'Aren't you going to take me home?' A. That is right. Q. And then again she asked you if you wouldn't take her home? A. That is right. Q. And you said, 'No' you wouldn't take her home; you were going to take her to the police? A. Yes. Q. Did she ask you to take her to the police? A. No. Q. In fact, she didn't want to be taken to the police, did she? A. She didn't know what she wanted to do."

The testimony given by Mrs. Hassenphlug was quite similar to that given by her husband. After testifying that they saw the parked car while going up the grade, she went on to say:

"A. Just before we got there the door shut and I could hear something that sounded like somebody crying when we passed but it was not distinct. I didn't know for sure. After we got on by we heard the muffled screams and I told Charlie to stop; that there was somebody under that car because I had seen the mat. I said, 'There is somebody in that car in trouble' and to stop our car. He did and he backed a ways and I said, 'Back far enough so you can see what it is.' I had a flashlight in the jockey box and I reached in and grabbed it about the time the girl slumped. She didn't walk out; she more or less half—well, half fell out and she held her clothes in front of her and she came up to my side of the car and she looked up into my face and said, 'Won't you please, please help me' and at that time it seemed she sort of fell into the car and Charlie went up to turn around and when we got back the other car was gone. Q. Do you recognize that person as being [the complaining witness]? A. Yes, I do. Q. What was her condition at the time she got into your car? A. It was very bad. Q. Go ahead and tell the jury. A. Her hair was mussed up and she was crying and bent over when I saw her as I more or less flashed the light on the car that was over there. Q. What clothing did she have on at the time she came over to you? A. She had on a blouse. She didn't have any pants on; she was bare from the waist down. Q. Was she physically able at that time to talk and explain to you what had happened? A. No, she was not. Not at that time. I didn't really ask her any questions. I didn't want to embarrass her. Q. Could you tell what it was that caused her to stumble or fall? A. Oh, she just seemed weak. Q. And after she got in the car what did you do? A. We

drove up with her to where we went to turn around and came back to town and brought her with us. Q. Did she, at that time, after she got into your car, tell you what had happened to her or what had occurred? A. No, she didn't. We didn't ask her any questions and she didn't tell us. She said, 'Oh, my jaw,' and I says, 'Your jaw; what is the matter with your jaw?' And she says, 'He socked me in the jaw.' Q. What did you do with her after that? A. Well, we took her down to Beam. Q. Did you have any occasion to look at the girl or see her after you brought her down to Mr. Beam? A. Just as she got out of the car. We went home because Charlie was sick and he wanted to get home as quick as he could. Q. Did you observe or see any bruises on her? A. I saw the back of her. She didn't turn her face. I didn't get out of the car. I stayed in and they just drove up."

On cross-examination, Mrs. Hassenphlug testified, in part, as follows:

"Q. When that girl got out of the car you say she tumbled or stumbled? A. She seemed in a weakened condition. Q. That was as she was coming out of the door? A. I don't know that was just as she was coming out of the door, no. Q. Did she stoop? Did she stoop to pick up her clothes? A. I didn't see her stoop and pick them up, no, but she had them in her hand. Q. Was anybody else outside on the road? A. No. Q. Mr. Linton was inside of his car? Where was he sitting? A. He was on the opposite side from the wheel. Q. That would be on the right hand side? A. Yes. Q. Facing forward? A. Facing down the road. Q. How close were you to his car as you flashed the flashlight? A. We were fairly close because the roads are not very wide. There is only about as far as from here to the other side of where Mr. Moss is sitting. Q. You mean to the railing? A. Well, approximately. Q. You had backed up so as to get that close? A. Yes, we backed up. Q. You were right in the middle of the road? A. Yes, we backed up in the road. Q. Well, Mr. Hassenphlug could have backed up clear back past the car and driven up in front of it so it couldn't have gotten away, couldn't he? A. Yes, he could have. Q. You stayed there and the girl came up to the car and said, 'Won't you please, please, help me?' A. Yes. Q. Are those the exact words she used? A. Yes, they are. Q. Did she say it the way you said it? A. Yes, she begged. It was in a begging tone. It was really pathetic. Q. And she didn't get into the car until after she had asked your permission? A. She

asked first and I had not given her permission. She asked and then opened the door and got in. Q. All she said on the way to town was something about her jaw and that he socked her? A. Yes. Q. Is that the way she said it? A. She was complaining. She said, 'Oh, my jaw' and I says, 'Your jaw? What is the matter with your jaw' and she said, 'He socked me.' Q. She used the word 'sock'? A. Yes. Q. She didn't say he 'hit' me or 'struck' me? A. No, she said, 'socked me'. Q. Then you drove on and didn't pay any attention to the other car at all? A. No, we didn't. We had to turn around and we wanted to get the girl back to town as soon as we could. . . . Q. By the time you got back to town she was able to talk normally, wasn't she? A. Not too well. Q. She had asked to be taken to Omak? A. Naturally a girl wants to be taken home. My daughters would ask the same thing."

The Hassenphlugs testified that, when they reached Okanogan, they turned the girl over to Night Marshal Beam. Officer Beam testified, in part, as follows:

"Q. Were you on duty and working on the night of August 10th? A. Yes. Q. Just relate to the jury where you saw the girl that night and the circumstances. A. I just got through patrolling the town. We have our own private place to park by Clair Greeley's service station and I just drove up there and in about two minutes here come a car up and it was Mr. Hassenphlug and he said, 'I have a case for the police department.' I says, 'What is that?' and he says, 'I have a girl here' so I picked the girl up and put her in the car and brought her up and turned her over to Mr. Moss. Q. Just what was the girl's appearance and physical condition? A. She was crying and she was holding her hand over her face—I should say her left hand, and sobbing so we brought her up here. After I brought her up here I stayed about fifteen minutes with Mr. Moss and Mr. Weitz. She was sobbing and we couldn't get any information out of her so I knew Mr. Hassenphlug so I turned around and went after Mr. Hassenphlug to see what car it was, and Mr. Moss and Mr. Weitz worked on the other end and they were the ones that found him. Q. This was some fifteen minutes or so after she was brought in that she was unable to talk to you and tell you what occurred? A. No, I never got any satisfaction out of her at all. Q. What was the reason for that? A. She kept putting her hand over her face and saying, 'I have been hit; I have been hit' and that was all we could get

out of her. Q. Was she able to talk clearly? A. ·No. Q. Was that due to her condition at that time? A. I would say it ·was. Q. Was she crying all this time? A. It was not a cry; it was a sob."

On cross-examination, Officer Beam testified:

"By Mr. Mansfield: Q. When did you see the bruise? A. Well, I seen it when Mr. Hassenphlug took her out of his car. He took her out of the car; she come up on my left and I went over and got her by the arm and took her around and put her in the right side of my car. I noticed it then because we had a good light there, and then I noticed it again in the sheriff's office. . . . Q. Charlie Hassenphlug couldn't tell you anything about what had happened to the girl? A. No. Q. You just took the girl from him and took her to the sheriff? A. I took her from his car and put her in my car and brought her up as fast as I could. Q. What happened to Charlie? A. I don't know. Fifteen minutes later I went to find him but he had went home. I tried to locate him at his son-in-law's. Q. You didn't ask him anything about what happened to her? A. No, I figured the place for her was the sheriff's office and let him take care of her. Q. She wouldn't talk? A. No, she never said a word to me. She just sobbed and cried. Q. Did she appear to be drunk? A. No. Q. Do you know whether she was or not? A. I wouldn't say she was. You couldn't smell anything on her or anything like that so I would say she was not drunk."

We may say at this point that the attorneys who represent the appellant in this court took no part in the trial of the case. Working from the record, they have made nine assignments of error in their briefs. In compliance with the rules of court, the appellant's brief states the questions involved in the appeal. These statements, of course, amount to a digest of the assignments of error. Instead of taking up and discussing each and every assignment of error, we will, in some instances, discuss the questions involved as stated in appellant's brief.

Appellant states the first question involved as follows:

"Should a prosecuting witness be corroborated, in a statutory rape case, by permitting other witnesses to relate the details of complaints made by her some time after the event?"

It is apparent, from the appellant's first assignment of error and the argument in support thereof, that the "other witnesses," referred to in the statement of the question involved, are Mr. and Mrs. Hassenphlug, Officer Beam, and Deputy Sheriff Weitz.

Substantially all of the testimony given by the Hassenphlugs has been hereinbefore quoted. Upon examination of that testimony, it will at once be seen that appellant's own trial counsel, in cross-examination of the Hassenphlugs, brought out about the only details of the complaints made to them by the complaining witness after she got into their car. To substantiate that statement, we first quote briefly from the cross-examination of Mrs. Hassenphlug by Mr. Mansfield who represented the appellant at the trial:

"Q. You stayed there and the girl came up to the car and said, 'Won't you please, please, help me?' A. Yes. Q. Are those the exact words she used? A. Yes, they are. Q. Did she say it the way you said it? A. Yes, she begged. It was in a begging tone. It was really pathetic. . . . Q. All she said on the way to town was something about her jaw and that he socked her? A. Yes. Q. Is that the way she said it? A. She was complaining. She said, 'Oh, my jaw' and I says, 'Your jaw? What is the matter with your jaw' and she said, 'He socked me.' Q. She used the word 'sock'? A. Yes. Q. She didn't say he 'hit' me or 'struck' me? A. No, she said, 'socked me'."

In his cross-examination of Mr. Hassenphlug, defendant's counsel asked him several times what the complaining witness said when they were taking her to Okanogan.

"Q. Did she ask you to take her to the police? A. No. Q. In fact, she didn't want to be taken to the police, did she? A. She didn't know what she wanted to do."

The following testimony was also brought out by defendant's attorney in cross-examining Hassenphlug:

"Q. You couldn't see any marks on her anywhere? A. When we got her downtown I saw her when she got out of the car. She had swelling on her jaw. Q. What kind of mark was that? A. Just as I say, it was a swelling. Q. Was it black? A. I couldn't see it in the dark, I hope. Q. Well, if you couldn't see whether it was black or not you couldn't

see whether it was swelled or not. A. It was not so dark. It was on the street right in front of Greeley's service station. Q. You couldn't see whether it was swelled much or not? A. I couldn't. I took her by the arm to help her out of the car. . . .

"MR. MANSFIELD: Q. Did you ever see any other marks or bruises on [the complaining witness]. A. No. Q. You didn't see any marks on her fingernails? A. No. Q. Did you go up to the jail with her? A. No. Q. You just looked her over under the street light downtown? A. That is all. Q. She didn't tell you anything that happened, did she? A. Yes. Q. I mean that night. A. Yes. Q. I thought you said she was so hysterical she couldn't talk? A. She wasn't when we got back towards town. Q. She snapped out of it right away? A. I asked her where she lived and she told me Omak. Q. Did she ask you then to take her to Omak? A. No, she didn't ask me. She said, 'Are you going to take me home?' She didn't know the wife and I; she had never seen us before."

Appellant's objection is evidently primarily based upon what was properly brought out by the re-direct examination which immediately followed his cross-examination:

"Q. Counsel wanted to know about what [the complaining witness] talked to you about that night. What did she tell you on the way in? MR. MANSFIELD: I object to that. MR. HANCOCK: It is something he brought out and asked. THE COURT: What is the objection? MR. MANSFIELD: It is improper examination to ask the witness what she told him. That is the reason I didn't ask him. THE COURT: Objection overruled. MR. MANSFIELD: Exception. THE COURT: You may have an exception. MR. HANCOCK: Q. Go ahead and tell the members of the jury what she did tell you and what she said on the way in. A. After we come in—I first asked her if she had been drinking and she said, 'No' and after a little bit I asked her who it was and she said she didn't know his last name; she knew his name was Ralph and pretty soon she told me that he *put* near smothered her; that when we drove up she said he was holding his hand over her mouth and she nearly passed out while he was holding her and she got out of that and then he hit her. Q. Did she tell you where he had struck her? A. Yes. Q. Where was it? A. Right on her jaw. She was holding her jaw and crying about it."

██ If the admission of that evidence was error, appellant's trial counsel certainly invited it, and later emphasized its subject matter, in his recross-examination which immediately followed, by requiring the witness to detail what the girl told him. Evidently, he got more information than he wanted.

"MR. MANSFIELD: Q. You say you asked her if she had been drinking? A. Yes. Q. And she said she had not? A. Yes. Q. And then you say she told you that he almost smothered her just as you went by? A. Yes. Q. And then he hit her? A. Well, I don't know which come first, but I know that he had hit her or held his hand over her mouth one way or the other whichever it was. Q. She was holding her jaw and running to your car at the same time, is that right? A. And had her clothes right over in front of her. Q. And holding her jaw with her other hand? A. Holding her clothes down in front of her. She held her jaw after she got in the car because I got one look at her. Q. As I understood it from what you said, that first she said he smothered her and then hit her. A. It was one way or the other. It was smothered her first and then hit her or the other way. Q. She didn't complain about him hitting her any other time, did she? A. That is all she said about it. Q. She was pretty upset when she got to your car and saw who you were? A. I don't think she even saw who we were. Q. I didn't ask you what you thought. I asked you about her condition. She was pretty upset, wasn't she? A. That is right. Witness excused."

No testimony was given by the Hassenphlugs that the complaining witness told them who the man in the car was, or that he had abused her in any way other than by striking her or, as Mrs. Hassenphlug phrased it, "socking her on the jaw." Nor was any testimony given by Night Marshal Beam that the girl complained of anything other than, while holding her hand to her face, she repeatedly sobbed, "I have been hit, I have been hit."

However, it is the admission of certain testimony given by Deputy Sheriff Weitz that appellant specifically assigns as reversible error. Weitz gave a great deal of testimony, much of which was damaging to defendant's case. But we are at this point exclusively concerned with the compara-

tively scanty testimony he gave as to what the complaining witness told him on the night of August 10, 1948. Early during the examination of Weitz, he was asked if he saw the complaining witness that night, and he replied that he did. He was then asked: "Will you just relate to us and tell us the conditions and circumstances under which you met the girl?" and he began his answer as follows:

"A. About 11:30 we got a call to come to the office; that there was a girl in the office that had been beaten up, so we came to the office and we saw [the complaining witness]. The sheriff came to the office and our night man was in the office, and Mr. Beam was in the office so we immediately went to questioning the girl as close as we could to find out what had happened to her. She told us that she had been raped and she gave us a pretty close description of the assailant. She also told us the occupation of the assailant. She told us that the suspect lived in or near Omak, so we were able to pretty near tell who the assailant was from the description that the complaining witness gave, so we took the complaining witness, the sheriff and I, with the complaining witness left the office."

That was the only testimony given by Weitz as to the complaints which the girl made to the sheriff and his deputies, and no motion to strike it or any part of it was made by defendant's counsel. After stating the substance of that testimony in his brief, appellant continues as follows:

"Clearly all this line of testimony was incompetent and prejudicial, being hearsay of the most dangerous kind. There is a special rule in statutory rape cases that, due to the nature of the crime, it is presumed that the victim would at the first opportunity make complaint to her family or friends, and the state is permitted to prove that she did so, either by the witness herself or by the persons to whom she complained. Such persons are, however, strictly limited to testifying to the bare fact that complaint was made, nothing more. This rule is clear, simple and definite and has been consistently and rigidly adhered to by the Supreme Court in all cases which have been brought before it, except in one or two cases which will be later noticed, where statements were held to be a part of the *Res Gestae*."

That is a reasonably accurate statement of the law on the question raised by assignments of error Nos. 1 and 2, al-

though the cases on the subject are not as harmonious as therein suggested. In supporting the statement, above quoted, appellant first cites *State v. Hunter,* 18 Wash. 670, 52 Pac. 247, decided in 1898, and *State v. Griffin,* 43 Wash. 591, 86 Pac. 951, decided in 1906. See comments on those cases in an opinion of this court handed down in 1914 in *State v. Gay,* 82 Wash. 423, 144 Pac. 711.

The statements made by the complaining witness to the Hassenphlugs were made at or near by the very place where the crime was alleged to have been committed, and so contemporaneously as to be fairly regarded as spontaneous, and, as appellant suggests, may, therefore, be regarded as part of the *res gestae. State v. Smith,* 3 Wn. (2d) 543, 101 P. (2d) 298. See, also, Article on *Res Gestae* by Edmund M. Morgan, Professor of Law, Harvard Law School, 12 Wash. L. Rev. 91.

It was also admissible evidence to prove that the complaining witness properly and promptly made hue and cry. See the very recent opinion in *State v. Murley,* 35 Wn. (2d) 233, 212 P. (2d) 801.

Furthermore, the statements made by the complaining witness to the Hassenphlugs were very scanty and did not purport to give the details of what had taken place, except that she told them that she had been "socked on the jaw." The complaining witness did not even tell them that she had been raped, nor did she give them the name of the man in the car. Moreover, such rather trivial statements as the girl made to the Hassenphlugs were in effect brought out by defendant's own counsel on cross-examination. In fact, all of them were, except a few which the state's attorney brought out on redirect examination, which, under the circumstances, it was proper for him to do. Nor was any testimony given by Night Marshal Beam that the girl complained of anything other than, while holding her hand to her face, she repeatedly sobbed, "I have been hit, I have been hit."

Since, as we have shown, the testimony given by Weitz, as to the complaints which the girl made to the sheriff and his staff, was offered without any objection by de-

fendant's counsel, that speaks for itself; that is, its admission cannot be assigned as error. We find no merit in assignments of error Nos. 1 and 2.

The appellant states that the second question involved in this appeal is:

"Should the cross-examination to affect credibility of the prosecuting witness and examination of other witnesses, both direct and cross, be denied as to specific prior acts of unchastity of such prosecuting witness in a statutory rape case?"

That question is raised by assignment of error No. 3, which reads as follows:

"The court erred in excluding testimony and in limiting the cross-examination of the complaining witness, her mother and the physician who examined her as to previous acts of unchastity upon her."

Upon cross-examination of the complaining witness, defendant's counsel asked her:

"Q. At what age were you when you had your first act of sexual intercourse? A. I never have. Q. I mean prior to August 10th, 1948."

The prosecutor objected to that line of cross-examination:

"THE COURT: You are objecting to the cross-examination that he is proposing to make concerning the possible previous acts of this witness?

"MR. HANCOCK: Because I feel it is not proper. This is a case where the defendant is charged with carnal knowledge of a female child under the age of eighteen years and certainly it does not matter whether she has had intercourse or whether she consented to it or not."

Whereupon counsel for the defendant propounded the following questions to the complaining witness:

"Were you prior to August 10th, 1948, ever afflicted with a venereal disease?"

Counsel then said:

"I will ask the same question as to the specific disease of gonorrhea."

"Were you ever prior to August 10th, 1948, pregnant?"

"Prior to August 10th, 1948, did you ever receive medical treatment or examination for gonorrhea or pregnancy?"

"Prior to August 10th, 1948, did you not admit to your mother that you had had sexual relations voluntarily?"

"Prior to August 10, 1948, did you ever treat yourself for a venereal disease or pregnancy?"

As each of the foregoing questions was asked, the prosecutor objected, and his objection was by the court sustained as to each and every question. Appellant's attorney asked for, and was granted, an exception to each of the aforesaid rulings. Later on in the trial, the matter came up in a somewhat different way. On the night of the tenth of August. Dr. Dewey, a physician practicing in Omak, was asked by the sheriff to make a thorough physical examination of the complaining witness. At the trial he was called by the state and testified concerning the examination. On cross-examination by defendant's counsel, the following occurred:

"Q. Doctor, did you not make a similar pelvic examination of this witness about a month previous? MR. HANCOCK: I am going to object to questioning along this line for the reason that such an examination, if it were made, would be a privileged examination between the doctor and the patient. We have asked about one examination that was made of the patient on the night of the 10th or 11th of August, which she has consented to, and I think the examination of the doctor should be confined to that. The question counsel is asking here would be improper cross examination of this witness."

Later, with regard to the previous chastity, or, rather the want of it, of the complaining witness, the defendant's counsel called her mother as a witness and asked her if she had not, on or about July 19th of this year (1948), caused her daughter to be medically examined to determine the existence of gonorrhea. The state's attorney objected, on the ground that such evidence was not pertinent to any issue in the case. The objection was sustained, and an exception was claimed.

The chastity of the complaining witness was not an issue in the case. The appellant was charged in court with committing the crime defined in Rem. Rev. Stat., § 2436, which reads, in part, as follows:

"Every male person who shall carnally know and abuse any female child under the age of eighteen years, not his wife, and every female person who shall have sexual intercourse with any male child under the age of eighteen years, not her husband, shall be punished as follows: . . ."

The charge in Count I was based upon the language of the statute, above quoted, and read as follows:

"That he, the said Ralph Linton, in the County of Okanogan, State of Washington, on or about the 10th day of August, 1948, did willfully and unlawfully carnally know and abuse one _____, then and there a female child under the age of 18 years, to-wit: of the age of 17 years, and not then and there the wife of the said Ralph Linton, all contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Washington."

Keeping in mind the wording of the statute and of the charge made against the defendant and that the defendant pleaded not guilty, what was the state required to prove in order to convict? It was required to prove:

(1) That the defendant carnally knew and abused the prosecuting witness;

(2) That, at the time of the offense, she was under the age of eighteen years; and

(3) That she was not the defendant's wife.

The state was not required to prove the previous chastity of the prosecuting witness, nor would proof of unchastity in any way rebut the state's proof that the defendant carnally knew her, or that she was under the age of eighteen years, or that she was not his wife. The statute merely says "any female child under the age of eighteen years," not any *chaste* female under eighteen years of age. From 1909 to 1919, there was a reference to chaste character in the rape statute, although with respect to the punishment only. We quote it:

"Every person who shall carnally know and abuse any female child under the age of eighteen years, not his wife, shall be punished as follows: . . .

"3. When such child is fifteen and under eighteen years of age, and *of previously chaste character,* by imprisonment

in the state penitentiary for not more than ten years, or by imprisonment in the county jail for not more than one year." Laws of 1909, chapter 249, p. 943, § 184. (Italics ours.)

Evidence as to previous chaste character was, therefore, directly pertinent in prosecutions under the 1909 statute. In 1919, the legislature reenacted and amended the 1909 statute, retaining subsection 3, above quoted, except that it omitted those words which are italicized in the quotation. Laws of 1919, chapter 132, p. 368. But it is not pertinent to any issue under the statute now in force, which is the statute of 1919.

If it was in any way pertinent in the instant case, it was only so as tending to affect the credibility of the witness. That opens up a question on which there is a great diversity of opinion. It is said in *State v. Pierson,* 175 Wash. 650, 27 P. (2d) 1068:

"Counsel for appellant, on cross-examination of the prosecuting witness, asked her questions designed to show that she was a delinquent and unchaste girl. It is now settled in this state that the character of a witness can be attacked only by showing his general reputation, and not by specific acts of misconduct, unless such specific acts are material to the main issue. *State ·v. Gaffney,* 151 Wash. 599, 276 Pac. 873, 65 A. L. R. 405. As pointed out in that case, there are exceptions in cases of seduction and statutory rape. In such cases, the prosecuting witness may be cross-examined as to specific acts of unchastity. *State v. Jones,* 80 Wash. 588, 142 Pac. 35; *State v. Godwin,* 131 Wash. 591, 230 Pac. 831. The exception does not extend, for obvious reasons, to cases of forcible rape."

We regret that those reasons are not set out in the opinions, for they are not obvious to us. It is perfectly obvious, however, why it has been held that the prosecuting witness, in a seduction case, may be cross-examined as to specific acts of misconduct. In such cases, such specific acts are material to the main issue, since the first sentence of our statute defining that crime (Rem. Rev. Stat., § 2441) reads as follows:

"Every person who shall seduce and have sexual intercourse *with any female of previously chaste character,* shall be punished by imprisonment in the state penitentiary for

not more than five years or by imprisonment in the county jail for not more than one year or by a fine of not more than one thousand dollars, or by both fine and imprisonment: . . ." (Italics ours.)

The statute so read when the *Gaffney, Godwin,* and *Pierson* cases were decided, it having been enacted and enforced since 1909 (Laws of 1909, p. 945, § 189). In seduction cases, therefore, the prosecuting witness may be cross-examined by the defendant as to previous acts of unchaste character because such specific acts are material to the main issue. But, as we have hitherto pointed out, the previous chastity of the prosecuting witness is in no way material to the main issue in a case where a male person is charged under Rem. Rev. Stat., § 2436. In such cases, of which the instant case is one, the only issues as to the prosecuting witness are: Was she carnally known, as defined in § 2437 of the statute, and, if so, when under the age of eighteen years and not the wife of the accused?

Having shown why there is, in this state, in seduction cases, an exception to the general rule, that the character of a witness can be attacked only by showing general reputation, and not specific acts of misconduct, unless such specific acts are material to the main issue, and that there is a similar exception in statutory rape cases, we will further attempt to determine why the exception has been made in such cases. In this case, the appellant strongly relies upon the opinion in *State v. Godwin,* 131 Wash. 591, 592, 230 Pac. 831, a statutory rape case. It is said, in the opinion:

"Of the trial, errors assigned there are two which we think of sufficient moment to require a new trial. The first is that the trial court denied the appellant the right to question the prosecuting witness as to her prior chastity. This was error under the authority of the following cases: [Citing cases.]"

We think we have found the philosophy, if philosophy it is, underlying the rule that the prosecuting witness, in statutory rape cases, may be examined as to previous acts of unchastity. It seems to have originated in the first of the cases cited in *State v. Godwin* in support of the rule, *State*

*v. Coella,* 3 Wash. 99, 28 Pac. 28. This was a murder case. It is said, in that case:

"One Gabrielle Monard was called and examined as a witness for the prosecution. Upon cross-examination, she testified that she was a married woman, whereupon defendant's attorney asked her a further question, as to whether she was not a prostitute. The prosecuting attorney objected to this question, which objection the court sustained, and an exception was taken. This was error also. The witness could have refused to answer the question upon the ground that it would tend to criminate her, as she could not be compelled to answer questions when such answers would furnish evidence to convict her of a criminal offense; but the law is well settled that this is a personal privilege, which the witness need not have availed herself of unless she desired to do so. Otherwise the question was competent, its office being to bring out a fact which would degrade the witness, thereby affecting her credibility. If she chose to answer and admit. if such was the fact, that she had wantonly violated the restraints and passed outside the limits which religion, society and the law have long established for woman's welfare and protection, her testimony would have been very seriously impaired. She could not have ruthlessly destroyed that quality upon which most other good qualities are dependent, and for which, above all others, a woman is reverenced and respected, and yet retain her credit for truthfulness unsmirched; but the fact that she could have declined to answer the question furnished no ground for an objection thereto by the prosecution. . . ."

A considerable section of the language, above quoted, has been quoted in subsequent opinions of this court. See *State v. Jackson,* 83 Wash. 514, 527, 145 Pac. 470.

However, there are other opinions in our reports which point out the evils of unrestricted examination of witnesses as to their sexual misconduct. In the opinion of the court prepared by Judge Rudkin in *State v. Belknap,* 44 Wash. 605, 608, 87 Pac. 934, we find the following:

"Courtrooms are bad enough when their proceedings are conducted under proper restrictions, and they should not be made schools for scandal. The extent to which cross-examinations will be permitted is no doubt in a large measure in the discretion of the trial court; and it is difficult to draw the

line as to where legal discretion as to the admission or exclusion of such testimony commences and where it ends; but we have no hesitation in saying that sound judicial discretion was abused in this case. Whether one of the witnesses was engaged to another woman, whether the engagement was broken off, and the circumstances surrounding such engagement, were questions wholly foreign to the issues in this case. The relations of the witnesses with other women, and whether one of them had been accused of or was guilty of bastardy, falls within the same category. Wharton's Criminal Evidence states the rule thus:

" 'Every man is entitled to such a measure of oblivion for the past as will protect him from having it ransacked by mere volunteers; and aside from this general sanction, if witnesses were to be compelled to answer fishing questions as to any scandals in their past lives, the witness-box would become itself a scandal which no civilized community would tolerate. Allow unqualified liberty in this respect, and no witness, no matter how respectable, could be sworn, without being required, if it should please the opposing party, to have even the most remote passages of his past life explored, and without being himself compelled to narrate any events in that life which were discreditable; no matter for how long a time such discredit had been atoned for by penitence, by reformation, and by correction of the wrong. Such inquisitions, however, the courts have refused to permit . . .' Wharton, Criminal Evidence (9th ed.), § 472."

See, also, the quotation in *State v. Gaffney, supra,* from *State v. Hill,* 52 W. Va. 296, 43 S. E. 160, and from *La Beau v. People,* 34 N. Y. 223.

 The rulings complained of in this appeal as to the refusal of the trial court to permit the defense to cross-examine the prosecuting witness, her mother, and their family physician as to her previous chastity, were, as we have pointed out, in the trial court's discretion, and, in our opinion, that discretion was not abused. The rulings were humane; for had the prosecuting witness been required to answer, she would have been subjected to an ordeal nearly as terrible as that she had undergone in the defendant's automobile on the lonely "corkscrew grade" on the evening of August 10, 1948.

■ We have reached the conclusion that the rule enunciated in *State v. Godwin*, 131 Wash. 591, 230 Pac. 831, and restated as dicta in *State v. Pierson*, 175 Wash. 650, 27 P. (2d) 1068, *State v. Gaffney*, 151 Wash. 599, 276 Pac. 873, 65 A. L. R. 405, and in several other opinions heretofore handed down by this court, to the effect that it is reversible error to deny the defendant, in a statutory rape case, the "right," as it is called in the *Godwin* case, of questioning the prosecuting witness as to her prior chastity, is illogical and contrary to the weight of authority in the courts of last resort of the United States. In other words, we now hold that the defendant, in a statutory rape case, has no such right. Whether or not such questioning of the prosecuting witness should be permitted should, in each individual case, be within the discretion of the trial judge.

See the elaborate note in 140 A. L. R. 364, entitled: "Admissibility in rape cases of evidence of previous unchastity, or reputation for unchastity, of prosecutrix," and particularly subsection (c) of that note, on page 375, entitled: "For purpose of impeaching credibility of prosecutrix." See, also, subsection (b), page 382, "Proof of specific acts of intercourse. 1. With third persons." See, also, note in 32 Mich. L. Rev. 251, entitled: "The unchastity of a female witness as a ground for impeaching her veracity," and especially that portion thereof beginning on page 254 with the following words:

"The underlying question which we propose to consider is this: Has the trait of chastity any such definite correlation with that of veracity that courts are justified in using the former as a criterion of the latter?"

The footnotes in the law review articles, above cited, are of great value, as they cite the opinions, on the question here involved, of such textwriters as Wigmore and Chamberlayne. We will quote from the opinion in *State v. Hammock*, 18 Ida. 424, 110 Pac. 169, because that case is similar, in many respects, to the case at bar. In that case, as in the case at bar, the prosecuting witness was under the age of consent, and, as in this case, the trial judge sustained objec-

tions to questions put by defendant's counsel to the complaining witness as to whether she had sexual intercourse with other persons prior to the alleged intercourse with the defendant. As in this case, it was also contended, on appeal, that the offered evidence was admissible as affecting the credibility of the witness:

"The court properly sustained the objections to the questions asked by counsel for defendant, as to whether the prosecutrix had ever had sexual intercourse with anyone prior to the time she submitted to that relation with the defendant. The fact that this girl, under the age of consent, had had intercourse with other men, or even if she had become a common prostitute, would constitute no defense for the defendant. [Citing a long list of cases.] If she was under the age of consent she could not have given legal consent to the violation of her person, and the fact that her person had been unlawfully and criminally violated by another would afford no justification for the defendant committing a like crime.

*"It is contended, however, that such evidence ought to be admitted for the purpose of throwing light on her credibility as a witness. While a lewd woman is less likely to be truthful than a chaste woman, still there is not such an immediate connection between unchastity and untruthfulness as to permit a woman's chastity to be called in question every time she goes on the witness stand."* (Italics ours.)

In an Illinois case in which the complaining witness was under the age of consent, it was insisted, upon appeal, that the trial court wrongfully excluded evidence as to the reputation of the complaining witness as to unchastity. The opinion reads, in part, as follows:

"The general reputation of the prosecutrix as to chastity is admissible when she is above the age of consent,—not as affecting her general reputation for truth and veracity, but because it would be more probable that an unchaste woman would consent to an act of sexual intercourse than one whose character was above reproach. This class of evidence goes to the question of consent, only. When the prosecuting witness is under the age of consent the question of her chastity cannot be material. If she is too young to consent to the intercourse, it is no answer to say that her reputation as to chastity is bad. Both text books and decisions are a unit in

holding that all evidence relating to the chastity of the prosecuting witness should be excluded when she is under the age of consent. [Citing cases.]

"The only authority relied on in support of plaintiff in error's contention on this point is *Shirwin v. People,* 69 Ill. 55. That case is not in point where the prosecuting witness is under the age of consent and is not in conflict with the authority already cited, for it was there said (p. 59): 'The admissibility of all this class of evidence is placed upon the ground that an unchaste woman would be more likely to consent to the act than a virtuous one, and therefore her previous connection with the accused or her general reputation for want of chastity are proper ingredients in determining the question whether the particular act in controversy was accomplished solely by force or with her virtual consent.' *If the reputation of the prosecuting witness for chastity were to be held admissible as going to her general credibility, then, logically, such testimony would be equally admissible as to the credibility of any female who might be called to give evidence in any case. The court properly excluded the evidence as to the reputation of the prosecuting witness for chastity." People v. Gray,* 251 Ill. 431, 96 N. E. 268. (Italics ours.)

The thought expressed in the last paragraph of the above quotation is found in many other opinions and in articles by textwriters. We think it is logically sound. It is stated even more strongly in a California decision from which we quote briefly:

"*If this class of evidence was admissible as going to the credibility of the testimony of the prosecutrix in its entirety, then it would be equally admissible as against the veracity of any female who might be called upon to give evidence in a case. Yet no such principle is recognized anywhere. . . ." People v. Johnson,* 106 Cal. 289, 39 Pac. 622. (Italics ours.)

Appellant's assignments of error Nos. 6 and 7 are as follows:

"6. The court erred in submitting to the jury the crime of assault in the second degree as charged in count II of the information and in instructing the jury upon said crime.

"7. The evidence was wholly insufficient to establish the guilt of the defendant of the crime of second degree assault,

to-wit: assault with intent to inflict grievous bodily harm as charged in count II of the amended information."

■ These assignments may be considered together and in the light of the instructions given as to Count II of the information:

"Instruction No. 13. *Assault in the Second Degree.* The statutory law of the State of Washington defining the offense of assault in the second degree specifies several different ways and manners in which such an assault may be committed. The Second Count of the Amended Information in this case is so worded as to charge the defendant, Ralph Linton, with such offense under sub-division 3. It therefore follows that said statute insofar as it pertains to the Second Count of the Amended Information in this case is as follows:

" 'Every person who, under circumstances not amounting to assault in the first degree—

" '(3) Shall wilfully inflict grievous bodily harm upon another with or without a weapon, shall be guilty of assault in the second degree.' "

"Instruction No. 14. *What Must Be Shown to Convict The Defendant On Count II.* Before the jury can properly find the defendant guilty as charged in Count II of the Amended Information, the evidence introduced here at the trial must convince you beyond a reasonable doubt of each and all of the following propositions, viz: That in Okanogan County, State of Washington, on or about the 10th day of August, 1948, as a part of the same transaction set out in Count I of the Amended Information, or connected therewith, the defendant did then and there wilfully and unlawfully inflict grievous bodily harm upon the person of ................ ................................ by then and there striking and hitting the said ............................ with his hands and fist."

In instruction No. 15, the members of the jury were instructed, in substance, that, if they were convinced beyond a reasonable doubt that the defendant committed the offense charged in Count II, they should then convict him of the charge in Count II, but, if not, they should acquit him of the charge in Count II.

In instruction No. 16, the members of the jury were instructed that there was also included, in Count II of the amended information, the crime of assault in the third de-

gree, and if they found that the state had not established beyond a reasonable doubt that the defendant did assault the prosecuting witness with his hands and fists, to such an extent as to inflict on the prosecuting witness grievous bodily harm, as defined in these instructions, then they should not find him guilty of assault in the second degree, but they could find him guilty of assault in the third degree if they found that the defendant assaulted the prosecuting witness with his hands and fists, but did not inflict on her grievous bodily harm.

In instruction No. 17, the court defined assault in the third degree.

In instruction No. 18, the court defined certain key words used in the instructions, as follows:

"Instruction No. 18. *The Words 'Wilful', 'Unlawful,' and 'Grievous Bodily Harm' Defined.*

"The foregoing words are used in these instructions and for that reason the court will define the meaning of the same as herein used:

"To do a 'wilful' act means exactly what the word implies; that is, it means to do an act wilfully, voluntarily and intentionally.

"To do an 'unlawful' act means the doing of an act that is without sanction of the law, or to do it contrary to law.

"The words 'grievous bodily harm' include any hurt or injury calculated to interfere with the health or comfort of the person injured; it need not necessarily be an injury of a permanent character. By 'grievous' is meant atrocious, aggravating, harmful, painful, hard to bear, serious in nature."

No exceptions were taken to the instructions given by the trial court, and, in our opinion, looking at them as a whole, they were adequate and appropriate, and as favorable and fair to the appellant as he could reasonably ask.

■ As to the contention in support of assignment of error No. 7, that the evidence was wholly insufficient to establish the defendant's guilt of the crime of second degree assault, we will say that we consider it was wholly sufficient. As we have hereinbefore shown, the court gave the jury the definition of assault in the second degree and in the third degree,

and, in our opinion, the evidence establishes an assault more serious than third degree, as defined in the instructions. The complaining witness testified that the defendant struck her violently in the jaw. Mrs. Hassenphlug testified that, when the complaining witness got into their car, she was crying violently, and when asked what the matter was, she said, "He socked me on the jaw." Beam, the Okanogan night marshal, who saw her not long after she escaped from the defendant's car, testified that she kept saying: "He hit me; he hit me." Those witnesses, and several other witnesses who saw her that evening, testified that she had a lump on her jaw. Furthermore, there is a photograph in evidence, taken of the complaining witness some two or three hours after she arrived at Omak, which is an exhibit in the case, and although we cannot see the black mark on the jaw, which was testified to by some of the witnesses, we can clearly see that her left jaw was swollen and lumpy about half way between her chin and her left ear.

We think the trial judge correctly defined "grievous bodily harm" in instruction No. 18, hereinbefore quoted. See *State v. Laughlin,* 105 Mont. 490, 73 P. (2d) 718. We quote briefly from the opinion in that case:

"The court's instruction numbered 6½, on which defendant's first assignment of error is based, is as follows: 'Grievous Bodily Harm. You are instructed that grievous bodily harm would include any hurt or injury calculated to interfere with health or comfort of the person injured; it need not be necessarily an injury of a permanent character. By grievous is meant atrocious, aggravated, harmful, painful, hard to bear, serious in nature.' "

In ruling upon assignments of error Nos. 6 and 7, hereinbefore quoted, we will adopt the language of the supreme court of Minnesota in *State v. Bowers,* 178 Minn. 589, 228 N. W. 164:

"What is grievous bodily harm is ordinarily a jury question. *State v. Gaularpp,* 144 Minn. 86, 174 N. W. 445. The court clearly submitted the question to the jury and permitted them to find defendant guilty of assault in either the second or third degree. We conclude that there was evi-

dence sufficient to justify the jury in finding assault in the second degree. Taking the evidence as a whole, it sufficiently sustains the verdict."

Instruction No. 8 reads as follows:

"CARNAL KNOWLEDGE DEFINED. You are instructed that for the purpose of this case the statutory law of the State of Washington, provides as follows:

" 'Any sexual penetration, however slight, is sufficient to complete sexual intercourse or carnal knowledge.'

"Amplifying the above you are further instructed that in order for there to have been 'carnal knowledge' in this case there must have been an actual penetration, however slight, of the female organ of the prosecuting witness by the male organ of the defendant, Ralph Linton, and unless you are convinced beyond a reasonable doubt there was an actual penetration, as above defined to you, then you cannot properly find the defendant guilty of 'carnal knowledge' as charged in the Information."

At the last (the *En Banc*) hearing of this appeal, appellant's counsel strongly stressed their assignment of error No. 8, which reads as follows:

"Under the evidence in this case the court should have given defendant's requested Instruction No. E relating to the included necessary offense of attempt to commit carnal knowledge, which instruction is as follows: . : ."

Requested instruction No. E read as follows:

"THE INCLUDED LESSOR OFFENSE OF ATTEMPT TO COMMIT CARNAL KNOWLEDGE. With respect to Count I of the Amended Information the Court charges you that if you think the evidence you have heard justifies you in so doing, you are at liberty to assume that there is included within the offense alleged in the Amended Information in Count I, the lesser offense of attempt to commit carnal knowledge. If you are convinced from the evidence, beyond a reasonable doubt, that the defendant in Okanogan County, State of Washington on or about the 10th day of August, 1948, did wilfully and unlawfully assault the said ................................................ with the intent then and there to perpetrate an act of sexual intercourse with her, but you are left with a reasonable doubt in your mind as to whether the defendant actually succeeded in accomplishing the act of sexual intercourse

with the said .................................................., then you should take up the question as to whether the defendant may be guilty of an attempt to commit carnal knowledge."

On this requested instruction, the trial judge endorsed the following:

"Not appropriate or applicable—Rejected
 Joseph Wicks, Judge
"Exception taken for failure to give, (by Defense). JW"

In appellant's brief, it is said, in support of assignment of error No. 8:

"The jury would have been well justified in finding that defendant had attempted to have carnal knowledge of the complaining witness, but had not succeeded in his attempt, and for this reason the requested instruction was not only proper, but failure to give it was prejudicial to his substantial rights."

We are convinced that instruction No. E was, as the court ruled, neither appropriate nor applicable. We do not feel at liberty to quote in full the necessarily salacious testimony as to what occurred in appellant's car on the "corkscrew grade" on the night of August 10, 1948. We may say, however, that there is no testimony in this record that would have justified a jury in finding that there was a mere unsuccessful attempt to commit the crime of carnal knowledge, as defined in Rem. Rev. Stat., § 2437, while there was ample evidence that the crime charged, as defined in that section of the code, was fully completed and consummated. In so stating, we have in mind, not only the very detailed and explicit testimony of the prosecuting witness, but a great deal of other testimony, such as that given by the Hassenphlugs, which tends to corroborate her version of the matter. Linton admitted that he drove the complaining witness to that point on the "corkscrew grade" where the Hassenphlugs encountered them that night, and that, when he had parked the car, he attempted to kiss her and there was a struggle over that for perhaps an hour after which he said they passed the remaining time in ordinary conversation. In view of the evidence of the Hassenphlugs as to the girl's condition when she ran to their car, calling for help, the jury could scarcely believe that version of the matter.

However, no corroboration was required. Chapter 100, Laws of 1913, p. 298, abolished the necessity of corroborating evidence, in rape cases, by repealing § 2443, Rem. & Bal. Ann. Code. See, also, *State v. Morden,* 87 Wash. 465, 151 Pac. 832.

In the annotation (60 A. L. R. 1124), entitled: "Necessity and sufficiency of corroboration of prosecutrix in prosecution for rape," it is said, on page 1125, citing many cases, including several of the decisions of this court:

"The rule in most jurisdictions is that in the absence of statute a conviction for rape may be sustained on the uncorroborated testimony of the prosecutrix."

In the instant case, the defendant denied the crime.

On page 1129 of the same annotation, many cases are cited to the following text:

"Even where the defendant denies the crime, the uncorroborated testimony of the prosecutrix may be sufficient to sustain a conviction for rape."

In the case of *State v. Hart,* 119 Wash. 529, 205 Pac. 836, the court gave an instruction in a carnal knowledge case, submitting to the jury the lesser offense of attempt to commit the crime charged. The jury found defendant guilty of attempted carnal knowledge. He appealed, and was given a new trial on the ground that the trial court erred in submitting the lesser offense to the jury, stating that there was no testimony in the case showing anything but completed acts of sexual relations.

We find no merit in appellant's assignment of error No. 8.

As we have hitherto said, we think the instructions given in this case were adequate and appropriate. There are other assignments of error, but we think that they are not of sufficient moment to justify or require a discussion *seriatim.* They have all been considered, and, in our opinion, are without merit.

The judgment and sentence from which this appeal is taken will stand affirmed. It is so ordered.

ALL CONCUR.

---

May 12, 1950. Petition for rehearing denied.