[No. 44197.   En Banc.   May 12, 1977.]

THE STATE OF WASHINGTON, *Respondent*, v. TIMOTHY ALLEN THOMPSON, *Appellant*.

*Herbert Gelman* (of *Gelman & Couture*) and *K. Michael Jennings,* for appellant.

*Don Herron, Prosecuting Attorney,* and *Joseph D. Mladinov, Special Counsel,* for respondent.

WRIGHT, C.J.—Defendant appeals from convictions of second-degree murder and second-degree assault.

On October 9, 1974, the body of Jan A. Cygan was discovered in a shallow grave on the Fife side of the Puyallup River near the Highway 99 bridge. The body was in a sleeping bag, with hands and feet bound. Cygan was last seen alive at defendant's house in Tacoma on or about August 7, 1974.

In an information filed October 11, 1974, defendant was charged with first–degree murder (RCW 9.48.030). That information was amended on November 20, 1974, to list decedent's name correctly. On January 16, 1975, with the trial court's permission, a second amended information was filed. In count 1 defendant was again charged with the first–degree murder of Jan A. Cygan. In count 2, defendant was charged with the second–degree assault of his wife, Janice Thompson, as part of the same transaction.

Counsel for defendant moved to sever counts 1 and 2, which motion was denied, and the trial began on February 5, 1975. The trial judge made several rulings during defendant's 5–day trial, to which rulings defendant objected and from which he appeals. The issues he raised are discussed herein in the order they were argued in his brief.

At the trial, the State called defendant's wife, Janice Thompson, as a witness. Out of the presence of the jury, the trial court ruled that the defense would have a continuing objection to her testimony.

Mrs. Thompson testified to the following: On August 6, 1974, she came home at about 5 p.m. When she arrived, defendant and some friends were present. After the friends left, defendant closed and locked the front and back doors, and turned up the stereo. He instructed his wife to come into the living room and sit on the couch. Defendant, who was holding "one of those small butane burners and a piece of rubber hose," accused his wife of adultery with Cygan. At first she denied it, but when defendant threatened to "torture . . . the truth out of" her, she admitted her infidelity. Defendant then hit her across the face with his hand causing her nose to bleed "pretty bad." Mrs. Thompson went into the bathroom and leaned over the bathtub. Defendant followed her in and beat her across the backs of her legs "a couple of times" with the rubber hose.

Mrs. Thompson continued to testify: About 8 or 8:30 p.m. that same evening, Cygan, who had been living at defendant's house, returned. Also present, when he arrived

was one Rick Seward, another prosecution witness. Mrs. Thompson, whose nose had stopped bleeding, was in the kitchen when she heard a noise from the front room that sounded like someone being hit and falling to the floor. She went into the front room and saw defendant "straddled across [Cygan's] chest and he [defendant] was hitting him [Cygan] in the face" several times. Defendant then dragged the man into a bedroom and tied him down to a set of metal bed springs. Defendant said he was going to kill Cygan, and he proceeded to beat him with a rubber hose "about ten to twelve times."

Mrs. Thompson then testified that she left the house with Rick Seward to go shopping. When they returned at about 10 p.m., Seward, defendant, and she went to Seward's house. Defendant and his wife returned home about 1 a.m. (August 7, 1974). All this time, Cygan was tied to the bed springs. Upon returning home defendant ordered his wife to go to bed. As Mrs. Thompson passed Cygan's bedroom, he raised his head. Instead of going to bed, Mrs. Thompson peeked out her bedroom door and saw defendant carrying Cygan in a sleeping bag out of the house. As defendant left the house, he bumped Cygan's head against the doorway and Cygan "moaned."

Finally, Mrs. Thompson testified that when defendant returned home at about 7 a.m. (August 7), his shoulders were dirty "like he had been crawling around in the dirt or something." Then she testified that her husband said, "'I killed him, he's dead.'"

While there was other evidence from which the jury might link defendant with Cygan's death, Mrs. Thompson's testimony was the only eyewitness account of the rubber-hose beating, and the removal of Cygan covered by a sleeping bag from the house. It is true, Mrs. Thompson testified that Rick Seward, another witness, saw the beating. Seward, however, testified he was outside and did not see any beating.

Defendant argues that the trial court erred when it permitted his wife to testify against him concerning the facts

relating to the murder of Jan Cygan. He argues that this is in violation of RCW 5.60.060(1). That statute provides in pertinent part:

> (1) A husband shall not be examined for or against his wife, without the consent of the wife, nor a wife for or against her husband without the consent of the husband; nor can either during marriage or afterward, be without the consent of the other, examined as to any communication made by one to the other during marriage. But this exception shall not apply to a civil action or proceeding by one against the other, nor to a criminal action or proceeding for a crime committed by one against the other, . . .

It will be noted that this statute covers two privileges, which are closely related, but separate. The first part of the quoted section covers testimony as to factual matters known to the spouse, regardless of how the spouse received the information. The second part of the section covers communications between the spouses. *See* 5 R. Meisenholder, Wash. Prac. §§ 164, 181 (1965, Supp. 1975). Both privileges are involved here. Mrs. Thompson testified as to statements made to her in private by defendant. She also testified to facts, that is, acts of the defendant done in her presence.

Defendant argues that a crime of personal violence must be committed by the defendant–spouse against the witness–spouse in order for the "crime committed by one [spouse] against the other" exception to apply, and that once the exception applies, the witness–spouse may only testify about facts relating to the crime of personal violence against that spouse. Defendant cites prior decisions by this court[1] and the Court of Appeals[2] in support of his argument.

---

[1]*See, e.g., State v. Beltner*, 60 Wash. 397, 111 P. 344 (1910); *State v. Kephart*, 56 Wash. 561, 106 P. 165 (1910); and *State v. Kniffen*, 44 Wash. 485, 87 P. 837 (1906).

[2]*See State v. Moxley*, 6 Wn. App. 153, 156–57, 491 P.2d 1326 (1971).

Respondent cites *State v. Briley*, 53 N.J. 498, 251 A.2d 442, 36 A.L.R.3d 811 (1969) in support of its position that defendant's wife should be allowed to testify against him about both the assault on her and the homicide of Jan A. Cygan. In *Briley*, defendant, armed with a shotgun, approached a car in which his wife and another (one Reaves) were preparing to leave. Reaves got out of the car and struggled with defendant. The gun discharged and Reaves received a stomach wound from which he died. Defendant's wife then jumped out of the car and tried to run away. She tripped and fell, however. Defendant, still holding the shotgun, caught up to her and struck her with the gun causing injuries. Defendant was charged in the same indictment with the murder of Reaves, and atrocious assault and battery of his wife.

■ By permitting defendant's wife to testify against him, the Supreme Court of New Jersey broadened the "crime committed by one spouse against the other" exception in their husband–wife privilege statute[3] to include the following situation, *State v. Briley, supra* at 507:

> If there is a single criminal event in which she and others are targets or victims of the husband's criminal conduct in the totality of the integrated incident and formal charges are made against the husband for some or all the offenses committed (one of which charges is for an offense against the spouse), the wife should be a competent and compellable witness against her husband at the trial of all the cases regardless of whether they are tried separately or in one proceeding. And, in this connection, it should be immaterial that the offense against the wife does not reach the same dimensions of criminality as it does against the third–party victim.

[3]N.J. Stat. Ann. § 2A:84A–17 (West 1976) provides in pertinent part:
"(2) The spouse of the accused in a criminal action shall not testify in such action except to prove the fact of marriage unless (a) such spouse and the accused shall both consent, or (b) the accused is charged with an offense against the spouse, a child of the accused or of the spouse, or a child to whom the accused or the spouse stands in the place of a parent, or (c) such spouse is the complainant."

In reaching its conclusion, at page 506 the New Jersey court argued that rigid adherence to the husband–wife privilege would promote "the suppression of truth," and that the principles of public policy make it more important in situations like this that the witness–spouse's testimony be available. *State v. Briley, supra* at 509. We agree with the New Jersey Supreme Court that in this carefully defined situation one spouse should be allowed to testify against the other. We agree with defendant, however, that CrR 6.12 does not supersede RCW 5.60.060(1). *See* 5 R. Meisenholder, Wash. Prac. § 164 (Supp. 1975) and CrR 6.12(c) which states, "This shall not affect any recognized privileges." The rule stated in *Briley* appears reasonable in view of the testimony in this case. At trial, Mrs. Thompson's testimony is the only evidence concerning the rubber–hose beating of decedent by defendant and defendant's act of carrying decedent out of the house. The lack of that testimony would definitely tend toward the suppression of truth.

Defendant argues further, however, that even if we accept the rationale of *Briley* the alleged crimes for which he is charged did not occur within the same transaction. We disagree. Both the assault upon Mrs. Thompson and the murder of Jan Cygan apparently stemmed from defendant's discovery of his wife's infidelity. Although he may have suspected her marital misconduct before August 6, 1974, it was then that she admitted the same. And while there was some passage of time between the assault and the murder, the logical relationship of the crimes is more important than any immediateness of connection in time in this case. We therefore hold that the trial court properly allowed Mrs. Thompson to testify about both the assault on her and the murder of Jan Cygan.

Defendant also argues that the trial court erred by failing to grant his motion to sever counts 1 and 2. We believe that the basic reason for this motion was to prevent Mrs. Thompson from testifying against defendant at the murder trial. However, we again agree with the New Jersey

court that Mrs. Thompson would be entitled to testify against her husband about both crimes, even if defendant were granted separate trials for each, because both crimes occurred in the same transaction. In any event, CrR 4.3 is a liberal joinder rule. CrR 4.3 did not supersede RCW 10.37-.060 and the two are consistent. We have held that RCW 10.37.060 gives the trial court considerable discretion in matters such as joinder of offenses. *State v. McDonald*, 74 Wn.2d 563, 445 P.2d 635 (1968). The same rule applies to CrR 4.3. We find no abuse of discretion and, therefore, the trial court's ruling is affirmed.

Defendant next argues that the trial court erred in failing to grant his motion to dismiss the second–degree assault count, and giving the jury instructions on second– and third–degree assault.

The motion to dismiss the second–degree assault count was renewed at the close of all the evidence, and thus was not waived. *See* Trautman, *Motions Testing the Sufficiency of Evidence,* 42 Wash. L. Rev. 787, 796 (1967). Defendant was charged under RCW 9.11.020 which provided in pertinent part:

Every person who, under circumstances not amounting to assault in the first degree—

. . .

(3) Shall wilfully inflict grievous bodily harm upon another with or without a weapon; . . .

. . .

Shall be guilty of assault in the second degree . . .

Defendant's basic argument is that there was insufficient evidence for this issue to go to the jury.

In *State v. Zorich,* 72 Wn.2d 31, 34, 431 P.2d 584 (1967), we said:

[A] challenge to the sufficiency of the evidence requires that the evidence be interpreted most strongly against the moving party and in the light most favorable to the opposing party, . . .

*Accord, State v. McDonald,* 74 Wn.2d 141, 142, 443 P.2d 651 (1968). And, in *State v. Cranmer,* 30 Wn.2d 576, 585, 192 P.2d 331 (1948), we said:

> In 23 C.J.S. 651, Criminal Law, § 1139, the rule is stated as follows:
> "Whether there is evidence legally sufficient to go to the jury is a question of law for the court, but where there is any evidence, however slight, and the evidence is conflicting or is such that reasonable minds may draw different conclusions therefrom, the question is for the jury."

*Accord, State v. Reynolds,* 51 Wn.2d 830, 834, 322 P.2d 356 (1958). In addition, whether an injury constitutes grievous bodily harm is ordinarily a jury question. *State v. Salinas,* 87 Wn.2d 112, 549 P.2d 712 (1976); *State v. Linton,* 36 Wn.2d 67, 216 P.2d 761 (1950). In the instant case, we feel that there was sufficient evidence, based upon Mrs. Thompson's testimony, for the jury to believe that a second–degree assault had been committed against her.

Next, the defendant claims that the court erred in admitting three color photographs of decedent's body after it was removed from the grave site and the sleeping bag. He argues that the prosecution's effort to use these photographs to identify decedent was simply a thinly disguised effort to prejudice the jury.

■ We have held in *State v. Vidal,* 82 Wn.2d 74, 80, 508 P.2d 158 (1973):

> The admission or rejection of photographs lies largely within the sound discretion of the trial court, and in the absence of abuse of this discretion, the trial court's ruling will not be disturbed on appeal.

(Citation omitted.) There was no abuse of discretion here. The photographs corroborated the pathologist's testimony. In addition, there was a question about the identity of the body, and one photograph revealed decedent's irregular eye tooth, thereby having probative value on the matter of identity.

It is next argued that the court erred in submitting jury instruction No. 14. That instruction reads:

You are instructed that if the evidence shows beyond a reasonable doubt that the victim, Jan Anthony Cygan, died as a result of a criminal act or acts, committed by the defendant, then you must convict. This is true even though the medical evidence may not be conclusive as to the exact cause of death.

Defendant contends that this instruction allows the jury to infer that the victim may have died as a result of the beating—an alternative he claims is not supported by any evidence.

We have long held that jury instructions must be read as a whole. *State v. Bixby,* 27 Wn.2d 144, 177 P.2d 689 (1947); *State v. Cooper,* 26 Wn.2d 405, 174 P.2d 545 (1946). And each instruction must be read in connection with all the others given. *State v. Alvis,* 70 Wn.2d 969, 425 P.2d 924 (1967). When instruction No. 14 is read together with instructions Nos. 3, 4, 5, 6, and 13[4] we believe that the jury was properly instructed to be convinced beyond a reasonable doubt that defendant's acts caused Cygan's death.

---

[4]Jury instruction No. 3 reads:

"To this information and the charge thereby made, the defendant has entered a plea of not guilty. This plea of not guilty raises every issue in the trial and it therefore becomes incumbent upon the State to prove to your satisfaction beyond a reasonable doubt every material element of the charge presented by this information and with which the accused stands charged."

Jury instruction No. 4 reads:

"You are instructed that each count in said information is charged as a separate and distinct offense and you must determine the guilt of the defendant as to each count.

"If you find that each of the elements of the particular offense have been established beyond a reasonable doubt in the particular count under consideration, then you should return a verdict of guilty of the crime charged in that count; on the other hand, if you find that the State has failed to prove any one of such elements beyond a reasonable doubt as to the defendant on a particular count, then you should find the defendant not guilty as to that count."

Jury instruction No. 5 reads:

"You are instructed that the law presumes the defendant to be innocent until he is proven guilty beyond a reasonable doubt.

"This presumption of innocence is not a matter of form which you may disregard at pleasure, but it is a part of the law of the land and is a substantial right guaranteed by that law to every person accused of crime, and it is your duty in this case to bear this rule of law in mind in considering the question of the defendant's guilt or innocence. This presumption continues with the defendant

■ Finally, we discuss defendant's assignment of error No. 6. Defendant took the stand in his own defense. He testified that he did not assault his wife, and he implied in his testimony that it was Rick Seward who was responsible for the death of Jan Cygan. On cross–examination by the prosecutor, Mr. Connelly, defendant was asked:

Q And never until this very day did you ever tell the authorities the story that you are telling here in court?

A Right after I was charged, I think it was the 12th of October, with first–degree murder, Officer Kowalski took me down to the arraignment and so on, took me into Lieutenant Legge's office, and they tried to question me in here again, and I knew at that time that it was Rick that had told them where the body was, and I asked Lieutenant Legge about it and he denied it and—

Q Never did you tell any one of the authorities that—

A May I continue, please?

Q —about this? That can be answered yes or no.

---

throughout all stages of the trial until the case has been finally submitted to you and you have found that such presumption has been overcome by the evidence in the case beyond a reasonable doubt. The defendant should be given the benefit of every reasonable doubt."

Jury instruction No. 6 reads:

"By the term 'reasonable doubt' is meant as the term implies, a doubt based upon reason—it must have something to rest on—and such a doubt arising either from the evidence or lack of evidence as a reasonable man would reasonably entertain. A doubt to be reasonable must be such a doubt as an honest, sensible and fair–minded man might with reason entertain consistently with a conscientious desire to ascertain the truth. A doubt which is fanciful, imaginary, a vague conjecture, a mere whim, or a groundless surmise, is not a reasonable doubt. A doubt to justify acquittal must be reasonable and must arise from a candid and impartial consideration of all the evidence. Guilt need not be proven beyond any possible doubt or with absolute certainty."

Jury instruction No. 13 reads:

"To constitute the crime of Murder in the Second Degree in the case before you, it will be necessary for the State to satisfy you beyond a reasonable doubt of the truth of each of the following elements:

"(1) That Jan Anthony Cygan was killed on or about the 6th day of August, 1974;

"(2) That the killing took place in Pierce County, Washington;

"(3) That the killing was done by Timothy Allen Thompson;

"(4) That the killing not being justifiable or excusable was done to effect the death of Jan Anthony Cygan."

A I tried to at that time. Detective Kowalski told me he didn't want to hear it. You can call the man in and ask him.

In the State's rebuttal, the prosecutor called Lieutenant Legge and Detective Kowalski to testify. Lieutenant Legge was asked:

Q (By Mr. Johnson) Lieutenant Legge, during the course of the interview on the 11th of October, 1974 in your office, that being the interview with the defendant, Timothy Allen Thompson, at any time during that interview did the defendant tell you that he knew or believed that any particular person was involved in the death—

MR. GELMAN: Objection; leading.

Q (By Mr. Johnson) —of Jan Cygan?

THE COURT: Overruled.

A No, he did not.

Q (By Mr. Johnson) Did the defendant make any statements to you at that time which you interpreted as him beginning to tell you or trying to tell you something?

A No.

MR. GELMAN: Objection.

THE COURT: Sustained. Instruct the jury to disregard the answer.

Q (By Mr. Johnson) After you told Mr. Thompson that you found the body, what did he reply?

A He said, "You found 'a' body."

Q Did he say anything else to you?

A I told him that I thought he had killed Jan and he says, "You'll have to prove it."

Q Did the interview continue beyond that?

A I think it was terminated then and he wished to be returned to the County Jail.

Later, Detective Kowalski was called to testify about the same interview. After it was established that defendant was in custody at the time of the interview, the prosecution asked:

Q Now, Detective Kowalski, on that date and in the time you had contact with the defendant, meaning from the time you picked him up in the County Jail until he was returned to the County Jail, at any time

did the defendant Timothy Allen Thompson tell you that some specific person other than himself was involved in the homicide of Jan Anthony Cygan?

A No, sir.

Q Did Timothy Allen Thompson say anything to you?

A Nothing.

Q Did you have contact with Timothy Allen Thompson on days other than October 11th?

A Yes, I did.

Q At any time during your, however many contacts there were with Timothy Allen Thompson in regard to this case, did Timothy Allen Thompson say anything to you about someone other than himself being involved in this homicide?

MR. GELMAN: Objection.

THE COURT: Overruled.

A No, sir.

Defendant claims that receipt of this testimony was improper because there was no CrR 3.5 hearing and no showing that defendant had been given his *Miranda*[5] warnings. There was no need for a CrR 3.5 hearing or any showing of compliance with *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).[6] The officers' testimony was introduced in rebuttal and our reading of the trial transcript leads us to believe that the prosecutor intended to use this testimony for impeachment purposes only, although the defense did not ask the trial court for such a ruling. *See Harris v. New York,* 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643 (1971). This case differs from the recent United States Supreme Court ruling in *Doyle v. Ohio,* 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). In that case, defendants took the stand in their own defense and gave exculpatory stories. On cross-examination, the prosecutor asked each defendant whether he had given this story to police officers after each was arrested.

---

[5]*Miranda v. Arizona,* 384 U.S. 436, 467–73, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).

[6]Defendant does not claim that his statements "'You found "a" body,'" and "'You'll have to prove it,'" were coerced or involuntary. *See Harris v. New York,* 401 U.S. 222, 224, 28 L. Ed. 2d 1, 91 S. Ct. 643 (1971).

Both defendants testified in effect that they had remained silent after their arrest. The Supreme Court held that the prosecutor's cross–examination of defendants about their post–arrest silence violated the due process clause of the fourteenth amendment to the United States Constitution. The court reasoned at pages 617–18:

> Despite the importance of cross–examination, we have concluded that the *Miranda* decision compels rejection of the State's position. The warnings mandated by that case, as a prophylactic means of safeguarding Fifth Amendment rights, see *Michigan* v. *Tucker,* 417 U. S. 433, 443–444 (1974), require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post–arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. See *United States* v. *Hale,* 422 U. S., at 177. Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

(Footnotes omitted.) But in footnote 11 to the majority opinion, the court said:

> It goes almost without saying that the fact of post–arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest. Cf. *United States* v. *Fairchild,* 505 F. 2d 1378, 1383 (CA5 1975).

In the present case, defendant said he tried to tell the police that Rick Seward was responsible for Jan Cygan's

death right after he was arrested. Under these circumstances, the prosecutor had every right to contradict defendant's testimony with that of Lieutenant Legge and Detective Kowalski.

We have carefully examined the remainder of defendant's assignments of error, and finding no merit in them, we affirm.

ROSELLINI, HAMILTON, STAFFORD, and BRACHTENBACH, JJ., concur.

UTTER, J. (dissenting)—I dissent. The rule forbidding testimony by one's spouse against the other, cited by the majority (RCW 5.50.060(1)), is a legislatively–created rule. The difficult policy choices were made by the legislature and it has not chosen to engraft an exception similar to that created by the New Jersey court in *State v. Briley,* 53 N.J. 498, 251 A.2d 442, 36 A.L.R.3d 811 (1969) upon our statute. The *Briley* case, at page 507, allows a spouse to testify "[i]f there is a single criminal event in which she and others are targets or victims of the husband's criminal conduct in the totality of the integrated incident and formal charges are made against the husband for some or all the offenses committed . . ."

Our legislature amended RCW 5.60.060(1) in 1965 to include an exception for crimes against the child or ward of the husband or wife. *See* Laws of 1965, ch. 13, § 7. This amendment has not since been enlarged to include third persons. The Court of Appeals in *State v. Moxley,* 6 Wn. App. 153, 491 P.2d 1326 (1971), wrote an excellent historical analysis of the statute and emphasized the legislative intent that the privilege to testify extends, with the narrow exception of the 1965 amendment, only to crimes committed by one spouse against the other. In the face of a clear statutory expression of legislative intent and recent actions showing the legislature is aware of continuing pressures for

change in the rule, we should not step into this policy-making arena.

HOROWITZ and DOLLIVER, JJ., concur with UTTER, J.

Petition for rehearing denied August 4, 1977.