[No. 6158–2–III. Division Three. January 14, 1986.]

THE STATE OF WASHINGTON, *Respondent,* v. JOHN RICHARD QUINN, *Appellant.*

---

*Michael L. Cohen, Gail E. Mautner, Cohen, Keegan &
Goeltz, P.S., Mitchell J. Olejko, Susan J. Woyna, Davis,
Wright, Todd, Riese & Jones, Richard Hansen,* and *Allen
& Hansen, P.S.,* for appellant.

*Donald C. Brockett, Prosecuting Attorney, Clark D. Colwell, Deputy; Kenneth O. Eikenberry, Attorney General,* and *Ellen Arbetter, Assistant,* for respondent.

MUNSON, J.—John Richard Quinn appeals his convictions on 15 of 16 counts of knowingly submitting false medical claims under Medicaid (RCW 74.09.230(1) and (2)); one count of first degree theft (RCW 9A.56.030(1)(a)); and one count of second degree theft (RCW 9A.56.040(1)(a)). The theft charges were alleged to have been by deception as defined in RCW 9A.56.020(1)(b) in differing amounts so as to fall into the categories of first and second degree. The charges arose from third party billings submitted by physicians at Country Homes Medical Center between 1979 and 1981. At the conclusion of the State's case, Dr. Quinn moved for dismissal; the motion was denied; Dr. Quinn rested without presenting any evidence on his own behalf. The jury returned verdicts of guilty on all counts but one.

After graduating from medical school and completing 2 years in the Air Force, Dr. Quinn began a medical practice in Spokane. After 12 years he purchased a building and entered into a series of partnerships with other general and family practitioners under the name of the Country Homes Clinic. Dr. Quinn owned the building and the real estate. While the partnership was an equal partnership, the compensation each partner received was in direct proportion to their production of gross income. Each partner likewise paid a share of the expenses of the clinic based upon his personal gross revenue versus the gross revenue of the entire clinic. Thus, while each physician's income was totally independent of the success or failure of every other physician, it was in the interest of each that they have a successful practice economically.

Apparently, Dr. Quinn was the senior physician at the time these alleged charges arose. While each physician charged his own fee for services, the business office of the clinic did the actual accounting, record keeping, and billing. The quality of the services rendered is not an issue, nor is

there an issue as to whether the services were performed; rather the issue centers around the billing practices of the clinic. As Dr. Quinn succinctly states in his brief, all charges concerned one of three allegedly false and material representations about the services rendered in order to receive payment for the patient of the clinic: (1) the dates on which services were rendered were not true; or (2) the character of services rendered was not true; or (3) the dates on which lab services were performed were not true. Thus, Dr. Quinn and his partners received a greater amount than they would have been paid if the true circumstances of the medical services performed had been accurately billed.

These practices fall into basically three areas: separate billings when in fact the third party payors, be it Medicare, Medicaid or Medical Service Corporation, would only pay at a flat rate level; a deceitful or false diagnosis to assure payment when an accurate diagnosis would not; and the submitting of lab tests as having been done on different dates and under different diagnoses rather than a grouped test on one date, as well as representing tests having been conducted at the clinic when they were actually performed by an outside lab.

The following are examples of these categories: (1) A patient makes one office visit which required incidental services or procedures. The third party payors would pay for one office call; whereas the clinic would submit billings indicating that the incidental service, whether it be an injection, surgical, or other procedure, had occurred on a date other than the office call. (2) A flat fee was paid for prenatal care; the clinic would submit a different diagnosis, thus initially avoiding the flat fee payment. (3) Lab tests no longer need be done on an individual basis; due to modern technology, they can be done seriatim in a battery or panel on a more cost efficient basis. Here, they were charged as if done individually. Also, some lab work done outside the clinic would be billed as having been done in the clinic; thus, the clinic received payment exceeding reimbursement amounts.

Dr. Quinn does not seriously contest the proof of a corpus delicti or that the billing practices were, in fact, in violation of the statute. However, he emphatically argues there was insufficient evidence connecting him with those billing practices. He contends all the billing was done by the office manager, bookkeeper, and their other employees who, after a grant of immunity, testified to those practices. There is no direct evidence Dr. Quinn directed the billings be done in this manner.

Nevertheless, there is circumstantial evidence supporting Dr. Quinn's awareness and encouragement of the billing practices:

(a) Falsification of third party billings was a standardized practice of the operation of the clinic; this practice was utilized by all partners in the clinic; and was in effect when the office manager and bookkeeper were employed.

(b) Instruction sheets containing procedures for third party billings were kept at various nurses' work stations.

(c) Complaints about this practice were made known to Dr. Quinn; he voiced his approval and desire that they continue.

(d) During much of this time Dr. Quinn signed all his own third party billings; the procedure was there for him to see.

(e) Dr. Quinn asked his nurse to remind his patients the date the clinic was indicating medical services were being performed so they could verify those dates if contacted by Medical Service Corporation.

(f) When an outside lab indicated they would no longer bill the clinic for lab tests because of the new requirements of Medicare and Medicaid, Dr. Quinn ordered his employees to utilize another lab that would bill the clinic rather than the third party payors.

(g) When shown billing fee slips which billed laboratory tests as batteries or panels rather than on an individual basis, Dr. Quinn stated he did not want to lose the $70 on lab work associated with physicals and continued his usual method of billing. Sometime after the clinic was being

investigated, he indicated it would not look good if he was the only physician not billing these tests as batteries or panels.

(h) He chided another partner for billing lab tests as panels because of the reduction in the clinic's fee.

(i) While Dr. Quinn's billing seldom had to be changed to conform to these practices, other partners' billings were frequently changed. If he knew a particular diagnosis was not covered by one of these payors, he would change the diagnosis.

(j) On one occasion when confronted regarding certain billings which a medical technician believed improper, Dr. Quinn stated insurance companies underpay for medical care and this was one means of obtaining reasonable compensation.

(k) A former partner physician testified he discussed these irregularities with Dr. Quinn on numerous occasions; sometimes these discussions became heated confrontations. It was at least apparent to this witness Dr. Quinn was in charge of the business operation of the clinic. There was sufficient evidence to submit all counts to the jury.

Secondly, Dr. Quinn contends those accounts, which were related to billings by the doctors other than himself, were improperly admitted. The evidence clearly suggests Dr. Quinn had knowledge of, and legal accountability for, the overall plan or scheme which was composed of the individual billings. *Nye & Nissen v. United States,* 336 U.S. 613, 93 L. Ed. 919, 69 S. Ct. 766 (1949); *State v. Gladstone,* 78 Wn.2d 306, 474 P.2d 274, 42 A.L.R.3d 1061 (1970). Thus, the jury was entitled to consider the counts based upon the submission of improper billings by the other doctors.

Thirdly, Dr. Quinn contends since 16 counts were based on RCW 74.09.230, which was not enacted until 1979, the court erred in admitting evidence of billings submitted prior to 1979. The court weighed the relevancy versus the prejudice which could arise from the admission of this evidence and concluded it was admissible under ER 404(b), *i.e.,* proof of a common scheme or plan, the absence of mis-

take, and the knowledge of Dr. Quinn. Before admitting this evidence and in its written instructions, the court advised the jury the evidence was being admitted for these limited purposes. We find no error. *State v. Bowman,* 36 Wn. App. 798, 808, 678 P.2d 1273, *review denied,* 101 Wn.2d 1015 (1984).

Fourthly, Dr. Quinn contends the court erred in refusing to dismiss the second degree theft charge involving false Medicare billings inasmuch as the theft statute does not encompass theft from the federal government. He argues Washington lacks jurisdiction to prosecute for a crime against the federal government; fraud involving Medicare funds is punishable only under 18 U.S.C. § 641 (effective June 25, 1948).

■ Dr. Quinn was tried under state law. RCW 9A.56-.040(1)(a).[1] His conduct may also have constituted a federal crime under 18 U.S.C. § 641 (effective June 25, 1948). Nevertheless, 18 U.S.C. § 3231 (effective June 25, 1948) provides "[n]othing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof". As noted in *State v. Tidwell,* 32 Wn. App. 971, 976, 651 P.2d 228 (1982): "An act denounced by both federal and state sovereignties is an offense against the peace and dignity of both, and may be punished by each." Here, the plain reading of the theft statute, in conjunction with RCW 9A.04.070, indicates one may be tried and punished under the laws of this state for an offense committed herein "except when such offense is cognizable exclusively in the courts of the United States". The State had jurisdiction; the court did not err.

■ Fifthly, Dr. Quinn assigns error to the court giving instruction on a principal's liability through an act of an

---

[1] In defining "theft", RCW 9A.56.020 impliedly means the acquisition of "property or services of another" by an unlawful act, whether that act be taking, stealth, deception, or otherwise as defined therein. "Another" may be a government. *United States v. Jackson,* 470 F.2d 684, 689 (5th Cir. 1972). *See also State v. Kruger,* 145 Wash. 654, 655, 261 P. 383 (1927); *State v. Coss,* 12 Wash. 673, 675, 42 P. 127 (1895).

agent. One cannot be held accountable for the criminal acts of others, unless the State proves beyond a reasonable doubt that he in some manner associated himself with the venture, that he participated in it as something he desired to bring about, and that he sought through his actions to make it succeed. *Nye & Nissen v. United States, supra; State v. Gladstone, supra.*

■ Instruction 21 is an unchallenged accomplice instruction drafted in accordance with WPIC 10.51 with an additional sentence introducing the "ready to assist" element required by *State v. Rotunno*, 95 Wn.2d 931, 934, 631 P.2d 951 (1981). Instruction 22,[2] which is challenged, speaks to a principal being liable through the acts of an agent. Here, given the facts and the instructions' distinct utilization and repetition of the word "intentionally", *i.e.*, "ordered", "directed", "authorized", "encouraged", and "consented", there is no sound reason to believe the jury could not understand that commitment and readiness to assist were required before a finding of guilt. Furthermore, instruction 23[3] directs the jury's attention to the conclusion that if Dr. Quinn delegated these tasks and had no knowledge they were being performed improperly, he is not legally accountable. Instructions are to be read in context with all the instructions given. *State v. Thompson*, 88

---

[2]*Instruction 22 provides:*

"Whatever a person is legally capable of doing himself can be done through another as agent. If the unlawful acts of a defendant's employee or other agent, within the course of employment, are intentionally ordered or intentionally directed, or intentionally authorized, or intentionally encouraged or intentionally consented to by the defendant, the law holds the defendant responsible for such acts as though he personally committed them, and he is thereby legally accountable for the actions of that person."

[3]*Instruction 23 provides:*

"The defendant may rely upon the conduct of his employee in performing delegated tasks if he believes those individuals are qualified to accomplish the tasks which are delegated. *If you find that the defendant relied upon others to perform properly delegated tasks, and has no knowledge that they were being performed improperly, he is not legally accountable for the improper performance thereof.*" (Italics ours.)

Wn.2d 518, 527, 564 P.2d 315 (1977). We find no error.

■ Sixth, Dr. Quinn contends the court erred in refusing to give his proposed instruction on the statutory defense of claim of title made in good faith, RCW 9A.56-.020(2). There is no evidence to support such an instruction. *See State v. Wellington,* 34 Wn. App. 607, 612, 663 P.2d 496 (1983). There was no error.

■ Seventh, Dr. Quinn assigns error to the giving of instruction 10, defining knowledge. He submitted this instruction. During the instruction conference, his counsel stated "I withdraw my objection to Instruction No. 10 and its exception . . ." A party may not request an instruction and later complain that it was given, *State v. Boyer,* 91 Wn.2d 342, 345, 588 P.2d 1151 (1979), particularly when his exception is withdrawn.

■ Eighth, Dr. Quinn contends the court erred in refusing to include the language "an intent fraudulently to secure such payment" in the elements instruction on the false claim counts. RCW 74.09.230 sets forth three alternative means by which a crime can be committed. Dr. Quinn was charged under the first two alternatives. The third, which includes that language, was not charged. As to the first two alternatives, it is not a statutory element. There was no error.

Finally, he argues the court erred in refusing to admit documentary evidence of the rules, regulations, and internal memoranda of the third party payors concerning payment restrictions. He asserts this refusal denied him the right to cross–examine the representatives of the third party payors who testified about the payment qualifications, thus preventing him from negating any inference he knew the statements and billings were materially false or deceptive. He also contends he cannot be held criminally liable on the basis of oral testimony about internal agency policies which were neither authorized by statute nor properly promulgated as regulations so as to place the public on notice.

The trial court noted that Dr. Quinn was not charged

with violating any of the rules, regulations, or internal memoranda which he sought to introduce. Nor were they the subject for interpretation, for even a misinterpretation would not provide the claimant with a license to falsify claims. The trial court was correct.

The convictions are affirmed.

GREEN, C.J., and McINTURFF, J., concur.

Review denied by Supreme Court May 6, 1986.