# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58646-1-II |
| Respondent, | |
| v. | |
| RONALD KEITH MIDDLEBROOKS, JR., | UNPUBLISHED OPINION |
| Appellant. | |

LEE, P.J. — Ronald K. Middlebrooks, Jr. appeals his judgment and sentence, arguing the trial court erred by (1) joining separate offenses for a single trial, (2) allowing a law enforcement officer to identify Middlebrooks in surveillance camera footage, and (3) finding sufficient evidence to support the firearm sentencing enhancements on two assault charges. We affirm.

FACTS

A.    MAY 3 INCIDENT

1.    Robbery and Car Theft

In the early morning hours of May 3, 2022, Marc Stilwell and his girlfriend, Barbara Benigno,[1] visited a bank to withdraw cash. Stilwell drove himself and Benigno to the bank in his cream-colored Chrysler 300.

---

[1] Benigno passed away before trial and was not available to testify.

After parking, the couple walked up to the ATM (automatic teller machine) and withdrew $600 in cash. The couple then noticed a white SUV pull into the parking lot. Two men approached the couple and blocked them from leaving the ATM area. One of the men was carrying "a big black gun." 2 Verbatim Rep. of Proc. (VRP) (July 10, 2023) at 232. That man pointed the gun at the couple, told them to stop, and said that he wanted their money. The armed man ejected one of the bullets out of the gun to show the couple that the gun "was loaded and ready to shoot." 2 VRP (July 10, 2023) at 232. The armed man then took the Chrysler 300 keys from Stilwell, while his accomplice took the cash from Benigno. The armed man drove off in the Chrysler 300.

After the men drove away, Benigno called 911. The responding officer collected an unfired, .40 caliber ammunition cartridge from the scene. The responding officer also reported the Chrysler 300 as stolen to alert other law enforcement personnel.

The incident was captured on video by the bank's surveillance cameras. The video was admitted into evidence and published to the jury.

2. Gas Station Sighting

Around 2:03 AM on May 3, after the robbery occurred, Detective Tobin Volkman noticed a Chrysler 300 while on patrol. Detective Volkman observed the vehicle pull into a gas station. Because Detective Volkman had already been alerted to look out for the vehicle, he requested back up. When Detective Volkman and other officers approached the vehicle, it was unoccupied.

After securing the vehicle, Detective Volkman reviewed surveillance footage of the inside and outside of the gas station store. Both videos were admitted into evidence and published to the jury.

2

Surveillance footage from outside the store showed a Chrysler 300 entering the gas station lot and parking in front of the store around 2:02 AM. Around 2:04:30, a man and woman walked away from the car, they paused in front of the store, and the man entered while the woman walked towards the gas pumps. Surveillance footage from outside the store also showed Detective Volkman's police cruiser enter the gas station lot, the woman outside noticing Detective Volkman's arrival, and the woman going into the store.

Around the same time, surveillance footage from inside the store showed the man entering the store between 2:04 and 2:05 AM. The video captured the man's face and clothing clearly, and the man's clothing appears to be the same as the armed man's clothing on the bank surveillance footage. *Compare* Ex. 11, at 4:35-5:06 *with* Ex. 9, Camera 3, at 11:27.03-12:06.45. The inside surveillance footage then showed the woman entering the store and walking towards where the man had been. The woman and man then exited the store. After leaving the store, the outside surveillance footage captured the man getting into a white SUV and leaving the gas station while the police inspected the Chrysler 300.

B.     MAY 5 INCIDENT

Two days after the robbery, Officer Nile Teclemariam was on patrol when he noticed a vehicle without a license plate; however, the vehicle fled before Officer Teclemariam could investigate. Because Officer Teclemariam had seen the vehicle exit a nearby hotel's parking lot, he went to the hotel to view its surveillance footage.

The hotel surveillance footage depicted a man and a woman exiting an unlicensed Prius. The man and the woman entered room 214. Officer Teclemariam asked another officer to run the Prius' vehicle identification number and learned that the Prius had been reported stolen. Officer

3

Teclemariam then spoke with the hotel manager, who asked Officer Teclemariam to trespass the guests in room 214.

As Officer Teclemariam and Officer Stephen Moffitt approached room 214, the man Officer Teclemariam had seen exit the Prius earlier exited room 214. Officer Teclemariam recognized the man as Middlebrooks and called out his name, telling him to stop. When Middlebrooks continued walking away, Officer Teclemariam grabbed Middlebrooks' shoulder, pinned him against the door, and told him he was under arrest.

At that point, Middlebrooks hit Officer Teclemariam in the face and then on the cheek. In response, Officer Moffitt took Middlebrooks to the ground. Middlebrooks grabbed Officer Teclemariam and dragged him to the ground as well. Officer Moffitt then attempted to use a pain compliance technique on Middlebrooks, but Middlebrooks bit Officer Moffitt's hand.

A third officer—Officer Kaybree Eames—noticed the altercation and went to help. When Officer Eames arrived, she attempted to control Middlebrooks' legs. Middlebrooks continued resisting, so Officer Teclemariam told Officer Eames to tase Middlebrooks. Officer Eames grabbed Officer Teclemariam's taser and used it once on Middlebrooks. The taser caused Middlebrooks to stop resisting, and he was taken into custody. The altercation between the officers and Middlebrooks was captured on video, which was later admitted into evidence and published to the jury.

After handcuffing Middlebrooks, Officer Teclemariam noticed a bag under Middlebrooks' feet. When Officer Teclemariam picked up the bag, he felt the shape of a firearm inside it. Officer Teclemariam opened the bag and found a Glock 22 inside.

4

C.    PRETRIAL

For the May 3 incident, the State charged Middlebrooks with one count of first degree robbery, one count of theft of a motor vehicle, and one count of third degree theft. For the May 5 incident, the State charged Middlebrooks under a separate cause number with one count of first degree unlawful possession of a firearm, two counts of third degree assault, and one count of resisting arrest.[2]

1.    Motion to Join the May 3 and May 5 Offenses

Prior to trial, the State moved to join the May 3 and May 5 offenses and to amend the information to add firearm sentencing enhancements to the two assault charges and to add one count of first degree robbery, also with a firearm sentencing enhancement. Middlebrooks objected.

Middlebrooks argued that joinder was inappropriate because trying the May 3 and May 5 charges together would prejudice him. Specifically, Middlebrooks asserted that allowing the jury to hear evidence from the May 5 officers and to see video of the May 5 assaults would prejudice Middlebrooks in defending against the May 3 charges, where his defense—no way to identify him as the robber—was much stronger.

The trial court granted the State's motion and joined the May 3 and May 5 offenses. The trial court also entered written findings of fact and conclusions of law. The trial court's findings and conclusions relevant here include:

---

[2] The original information for the May 5 offenses is not in the record on appeal.

No. 58646-1-II

<u>FINDINGS OF FACT & CONCLUSIONS OF LAW</u>

. . . .

2.  Based on the representations by the State of the alleged facts, the alleged robbery by use of a firearm on 05/02/22[3] and the subsequent arrest involving an alleged assault of the police officers on 05/03/22[4] are based on the same conduct or series of acts constituting one single scheme or plan, when the officers found a firearm in the defendant's possession, are connected as a series of acts involving the same firearm.

. . . .

6.  The Court finds that the State's evidence on the offenses are similar involving evidence of possession of the firearm. The State represents that the offenses are provable through video and other identifying evidence of the defendant and the firearm allegedly used.

7.  The Court finds that the defenses on each count, although somewhat dissimilar, do not contradict one another or prejudice the presentation of the defendant's ability to present his current stated defenses to all of the listed charges.

8.  The Court finds that there is a presumption that jurors will follow the jury instructions concerning their requirement to consider each count separately. Although there may be instances where jurors do not adhere to this instruction, there is no evidence or indication given the nature of the charges that they would be unable to follow their instructions in this case.

9.  Evidence of the gun allegedly found on the defendant on 05/03/22[5], would likely be relevant and admissible evidence during the state's attempt to prove the earlier robbery on 05/02/22.[6]

10. The State represents that within the presentation of their case they will present evidence that the firearm matches the caliber of the ejected cartridge left at the scene of the robbery, the appearance of the Glock 22 matches the description provided by the witness, and the State will present evidence of toolmark identification connecting the ejected cartridge to the firearm.

---

[3] Bank surveillance footage establishes that the robbery occurred on May 3, and both Middlebrooks and the State allege the robbery occurred on May 3 on appeal. Presumably the trial court made a clerical error.

[4] Presumably, the trial court meant the assault on May 5, 2022.

[5] Presumably, the trial court meant the gun found on May 5, 2022.

[6] Presumably, the trial court meant May 3, 2022.

6

11. Evidence of the assault against the law enforcement officers is not found to be overly prejudicial to the defendant and the alleged unlawful possession of a firearm charge would be admissible and probative evidence to be presented during the states [sic] attempt to prove the alleged robbery on 5/02/22.[7]

Clerk's Papers (CP) at 26-27.

Pursuant to the trial court's joinder order, the State filed an amended information joining the May 3 and May 5 offenses. For the May 3 incident, the State charged Middlebrooks with two counts of first degree robbery and one count of theft of a motor vehicle. For the May 5 incident, the State charged Middlebrooks with one count of first degree unlawful possession of a firearm, two counts of third degree assault, and one count of resisting arrest. The two first degree robbery counts and the two third degree assault counts were charged with a firearm sentencing enhancement.

2.      Identification Testimony

Also prior to trial, the State moved to allow Officer Teclemariam to identify Middlebrooks as the person depicted in the gas station surveillance footage. Middlebrooks objected.

At the hearing on the State's motion, Officer Teclemariam testified that he had previously contacted Middlebrooks in September 2020, at which time Middlebrooks had a firearm. Officer Teclemariam also recounted his altercation with Middlebrooks on May 5. The trial court granted the State's motion, explaining it would allow Officer Teclemariam to identify Middlebrooks as the man in the gas station surveillance footage "based on his contact with the defendant on [May] 5th." 3 VRP (July 11, 2023) at 486.

---

[7] Presumably, the trial court meant May 3, 2022.

D.     TRIAL

At trial, the State's witnesses testified regarding the May 3 and May 5 incidents as set out above.  Additional testimony relevant to this appeal is included below.

1.     Witness Testimony

Stilwell testified that he "didn't get a good look at [the men's] faces" because the men wore face coverings and it was dark.  2 VRP (July 10, 2023) at 231.  Stilwell was only able to testify that the armed man was Black.  Furthermore, Stilwell was unable to identify Middlebrooks as either of the men who robbed him and Benigno.

Officer Teclemariam also gave identification testimony.  Officer Teclemariam identified Middlebrooks in court as the person he arrested on May 5.  Officer Teclemariam then stated that prior to testifying, he reviewed the gas station surveillance footage from May 3.  The man in the gas station surveillance footage was the same person Officer Teclemariam arrested on May 5—Middlebrooks.

2.     Fingerprint Evidence

Sheena Meara, a forensic technician with the Pierce County Sheriff's Department, testified that she compared two latent prints lifted from the Chrysler 300 with a known set of Middlebrooks' fingerprints.  By manually comparing the latent prints to a known set of prints, Meara was able to match two of the prints lifted from the Chrysler 300 to Middlebrooks.  Meara also testified that in her opinion, the prints could not have belonged to anyone but Middlebrooks.

Danielle McCready, another forensic technician, testified that she reviewed Meara's work and concurred with Meara's results.  Jordyn Casteel, a forensic investigator, also testified that she reviewed Meara's work and concurred with Meara's results.

3.      Firearm Evidence

Theunis Brits, a forensic scientist with the Washington State Patrol Crime lab, testified regarding the unfired cartridge recovered from the May 3 crime scene and the firearm recovered from the May 5 crime scene. Brits testified that the firearm he received was capable of holding 16 rounds: 15 in the magazine and one in the chamber. Brits explained that if Middlebrooks ejected an unfired cartridge from the firearm on May 3, the firearm would have 14 bullets in the magazine and one bullet in the chamber for a total of 15 bullets in the firearm. Officer Teclemariam testified that the firearm he recovered on May 5 was loaded with 15 bullets.

Brits also conducted a tool-mark identification analysis on the cartridge ejected on May 3 and the firearm recovered on May 5. Brits compared the unfired cartridge recovered from the May 3 robbery to two live rounds that he cycled through the firearm recovered from Middlebrooks on May 5. Brits concluded that "[b]ased on the quantity and quality of unique markings that I saw on the evidence piece, the unfired cartridge, it is my opinion that that unfired cartridge was cycled through the Glock 22" recovered on May 5. 4 VRP (July 12, 2023) at 600. Brits acknowledged that this was a subjective conclusion.

The jury found Middlebrooks guilty as charged. The trial court sentenced Middlebrooks to a total of 300 months confinement.

Middlebrooks appeals.

9

ANALYSIS

A.    JOINDER

Middlebrooks argues that the trial court erred by joining the May 3 and May 5 offenses for trial. Even assuming without deciding that the trial court erred by joining Middlebrooks' offenses for trial, any error was harmless.

1.    Legal Principles

"'Joinder' refers to bringing multiple criminal charges against one person as separate counts in a single charging document" and is governed by CrR 4.3(a). *State v. Bluford*, 188 Wn.2d 298, 305-06, 393 P.3d 1219 (2017). Under CrR 4.3(a):

> Two or more offenses may be joined in one charging document, with each offense stated in a separate count, when the offenses, whether felonies or misdemeanors or both:
>     (1) Are of the same or similar character, even if not part of a single scheme or plan; or
>     (2) Are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.

Trial courts have "'considerable discretion'" when it comes to joinder. *Bluford*, 188 Wn.2d at 310 (quoting *State v. Thompson*, 88 Wn.2d 518, 525, 564 P.2d 315 (1977), *overruled on other grounds by State v. Thornton*, 119 Wn.2d 578, 580, 583, 835 P.2d 216 (1992)). We review "a trial court's decision on a pretrial motion for joinder . . . for abuse of discretion."[8] *Id.* at 305.

---

[8] Middlebrooks argues that "[w]hether separate offenses satisfy [CrR 4.3's] textual requirements presents a legal question this Court reviews de novo." Br. of Appellant at 19 (citing *State v. Martinez*, 2 Wn.3d 675, 541 P.3d 970 (2024)). In *Martinez*, our Supreme Court recognized "some confusion over the proper standard of review" for joinder decisions. 2 Wn.3d at 681 n.3. While the court stated that "[b]ecause joinder must first be allowable under CrR 4.3, part of a reviewing court's analysis is interpreting court rules, which is a legal question and subject to de novo review," it was merely restating the well-establish rule that we review legal questions de novo, such as when the parties argue over the meaning of the words in CrR 4.3, as opposed to arguing over whether

A trial court abuses its discretion when its decision "is manifestly unreasonable or based on untenable grounds or reasons." *State v. Sanjurjo-Bloom*, 16 Wn. App. 2d 120, 125, 479 P.3d 1195 (2021). Because "a judge cannot abuse [their] discretion based on facts that do not yet exist," this court considers "only the facts known to the trial judge at the time [it rules on a pretrial joinder motion], rather than the events that develop later at trial." *Bluford*, 188 Wn.2d at 310; *accord State v. Martinez*, 2 Wn.3d 675, 682, 541 P.3d 970 (2024).

"If joinder was not proper but offenses were consolidated in one trial, the convictions must be reversed unless the error is harmless." *State v. Bryant*, 89 Wn. App. 857, 864, 950 P.2d 1004 (1998), *review denied*, 137 Wn.2d 1017 (1999); *see also State v. Watkins*, 53 Wn. App. 264, 273, 766 P.2d 484 (1989) ("Consistent with [the harmless error] rule, we conclude that misapplication of ER 404(b) in severance cases does not compel a new trial where, within reasonable probabilities, the error is harmless.").

2.      Any Error Was Harmless

Below, the trial court ordered that Middlebrooks' offense be joined together pursuant to CrR 4.3(a)(2):

> Based on the representations by the State of the alleged facts, the alleged robbery by use of a firearm on 05/02/22[9] and the subsequent arrest involving an alleged assault of the police officers on 05/03/22[10] are based on the same conduct or series of acts constituting one single scheme or plan, when the officers found a firearm in

---

the facts of a specific case satisfy the rule's textual requirements. *Id.* Moreover, the *Martinez* court reaffirmed that "the standard of review of trial court motions granting or denying joinder motions is abuse of discretion." *Id.*

[9] Presumably, the trial court meant May 3, 2022.

[10] Presumably, the trial court meant May 5, 2022.

11

the defendant's possession, are connected as a series of acts involving the same firearm.

CP at 26. We need not address the merits of the trial court's ruling because even assuming without deciding that Middlebrooks' offenses were joined in error, any error was harmless.

a.       May 3 offenses

Here, any error was harmless because even if Middlebrooks had faced separate trials for his May 3 and May 5 offenses, there is a reasonable probability that the jury would have convicted Middlebrooks of two counts of first degree robbery and one count of theft of a motor vehicle.

"A person commits robbery when [they] unlawfully take[] personal property from the person of another or in [their] presence against [their] will by the use or threatened use of immediate force, violence, or fear of injury to that person or [their] property or the person or property of anyone." RCW 9A.56.190. First degree robbery occurs where, "[i]n the commission of a robbery or of immediately flight therefrom," the defendant "[i]s armed with a deadly weapon" or "[d]isplays what appears to be a firearm or other deadly weapon." RCW 9A.56.200(1)(a)(i)-(ii).

"A person is guilty of theft of a motor vehicle if he or she commits theft of a motor vehicle." RCW 9A.56.065(1). "Theft" means "[t]o wrongfully obtain or exert unauthorized control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services." RCW 9A.56.020(1)(a).

Ample evidence shows that Middlebrooks robbed Stilwell and Benigno and stole Stilwell's vehicle on May 3. For example, bank surveillance footage captured the robbery on video. After pointing the gun at Stilwell and Benigno, the man and his accomplice took $600 from the couple

and their vehicle before fleeing the scene. The jury could have compared both Middlebrooks' in court appearance and the bank surveillance footage to surveillance footage from the gas station following the robbery to conclude that Middlebrooks was the person in the bank and gas station surveillance footages. Also, Middlebrooks' fingerprints were found on the Chrysler 300.

Furthermore, Stilwell testified that one of the men who robbed him was carrying "a big black gun" and that the same man pointed the gun at Stilwell and Benigno before ejecting one of the bullets to show the couple that the gun was loaded and ready to shoot. 2 VRP (July 10, 2023) at 232. The State would likely have introduced the gun recovered from Middlebrooks on May 5 to further prove his identity as the robber on May 3. And tool-mark identification analysis showed that the unfired cartridge used to threaten Stilwell and Benigno at the bank matched the unique markings of bullets fired with the gun recovered from Middlebrooks on May 5.

Thus, in light of the evidence, there is a reasonable probability that the jury would have convicted Middlebrooks of two counts of first degree robbery and one count of theft of a motor vehicle even if the May 3 and May 5 incidences were tried in separate trials.

b.      May 5 Offenses

Similarly, any error was harmless with regard to the May 5 offenses because there is a reasonable probability that the jury would have convicted Middlebrooks of one count of first degree unlawful possession of a firearm, two counts of third degree assault, and one count of resisting arrest.

A person commits unlawful possession of a firearm in the first degree "if the person owns, accesses, has in the person's custody, control, or possession, or receives any firearm after having

13

previously been convicted . . . in this state or elsewhere of any serious offense." RCW 9.41.040(1)(a).

A person commits third degree assault if, "[w]ith intent to prevent or resist the execution of any lawful process or mandate of any court officer or the lawful apprehension or detention of himself, herself, or another person, assaults another." RCW 9A.36.031(1)(a).

"A person is guilty of resisting arrest if he or she intentionally prevents or attempts to prevent a peace officer from lawfully arresting him or her." RCW 9A.76.040(1).

Here, the three officers involved in Middlebrooks' arrest provided ample evidence that Middlebrooks assaulted two officers and resisted arrest on May 5. Officer Teclemariam testified that when he attempted to arrest Middlebrooks on May 5, Middlebrooks hit him in the face and on the cheek. Officer Moffitt testified that after he and Officer Teclemariam took Middlebrooks to the ground, Middlebrooks bit Officer Moffitt's hand. Officer Eames witnessed much of the altercation and testified that Officers Teclemariam and Moffitt were trying to control Middlebrooks' hands and that Middlebrooks was actively resisting their attempts to control him. In fact, Officer Eames testified that it was not until she used a taser on Middlebrooks that he stopped resisting.

There was also ample evidence to show that Middlebrooks was in possession of a firearm on May 5. Officer Teclemariam testified that after handcuffing Middlebrooks, he noticed a bag near Middlebrooks' feet. When Officer Teclemariam picked the bag up, he felt the shape of a firearm inside it. Officer Teclemariam opened the bag and found a Glock 22 inside.

Thus, there is a reasonable probability that the jury would have convicted Middlebrooks of one count of first degree unlawful possession of a firearm, two counts of third degree assault, and one count of resisting arrest even if the May 3 and May 5 incidences were tried in separate trials.

Because there is a reasonable probability that a jury would have convicted Middlebrooks as charged, even if he faced the May 3 and May 5 charges in separate trials, any error in joining the offenses was harmless.

B.     IDENTIFICATION TESTIMONY

Middlebrooks argues that the "trial court improperly allowed Officer Teclemariam to identify Mr. Middlebrooks as the individual in the gas station surveillance footage."  Br. of Appellant at 38.  Middlebrooks argues that the trial court's error was not harmless because without Officer Teclemariam's testimony, there was insufficient evidence identifying Middlebrooks as the person in the May 3 bank footage.  Even assuming without deciding that the trial court improperly allowed the officer to provide identification testimony, any error was harmless.

Nonconstitutional errors are harmless if, absent the error, there is a reasonable probability that the outcome of the trial would not have been materially affected.  *See Sanjurjo-Bloom*, 16 Wn. App. 2d at 127-29 (applying nonconstitutional harmless error standard where trial court erred by allowing lay witness to identify defendant in surveillance footage).  Here, any error was harmless because even without Officer Teclemariam's testimony, there was ample evidence tying Middlebrooks to the May 3 robbery.

Even without Officer Teclemariam's identification testimony, the jury would still have been able to compare the man in the gas station surveillance video to Middlebrooks' in court appearance.  The jury also would have been able to compare the man in the bank surveillance

15

video to the man in the gas station surveillance video. Furthermore, the stolen vehicle that was recovered from the gas station on May 3 had two fingerprints lifted from its exterior that matched Middlebrooks' prints. And an expert testified that based on his forensic analysis of the firearm recovered from Middlebrooks on May 5, he concluded that the bullet found at the scene of the May 3 robbery had been cycled through the firearm recovered from Middlebrooks on May 5.

Thus, the evidence in the record shows a reasonable probability that the outcome of the trial would not have been materially affected by the trial court's error in allowing Officer Teclemariam's identification testimony. Therefore, even if the trial court erred by allowing the identification testimony, any error was harmless.

## C.   FIREARM SENTENCING ENHANCEMENTS

Middlebrooks argues that there was insufficient evidence "to support [the] firearm enhancements on Mr. Middlebrooks' two assault convictions" because the "mere presence of a weapon at a crime scene is insufficient to establish the" requisite nexus between crime and weapon. Br. of Appellant at 44. We disagree.

### 1.   Legal Principles

Pursuant to the Sentencing Reform Act of 1981, chapter 9.94A RCW, (SRA), the trial court must increase the sentence for certain felony crimes "if the offender . . . was armed with a firearm." RCW 9.94A.533(3). To support a firearm sentencing enhancement, the State must prove that the defendant "'is within proximity of an easily and readily available deadly weapon for offensive or defensive purposes and [that] a nexus is established between the defendant, the weapon, and the crime.'" *State v. Houston-Sconiers*, 188 Wn.2d 1, 17, 391 P.3d 409 (2017) (alteration in original)

(internal quotation marks omitted) (quoting *State v. O'Neal*, 159 Wn.2d 500, 503-04, 150 P.3d 1121 (2007)).

A sufficient nexus exists "when the defendant and the weapon are 'in close proximity' at the relevant time" and where "'the facts and circumstances support an inference of a connection between the weapon, the crime, and the defendant.'" *Id.* (first quoting *State v. Gurske*, 155 Wn.2d 134, 141-42, 118 P.3d 333 (2005), then *State v. Easterlin*, 159 Wn.2d 203, 210, 149 P.3d 366 (2006)). If the defendant did not use the weapon "in the commission of the crime, it must be there to be used." *Gurske*, 155 Wn.2d at 138. Thus, the State must demonstrate the defendant's "intent or willingness" to use the weapon in the commission of the charged crimes. *State v. Brown*, 162 Wn.2d 422, 434, 173 P.3d 245 (2007).

2.      Sufficient Evidence Supports the Firearm Enhancements

Middlebrooks concedes that he possessed the weapon on May 5. Thus, the only issues on appeal are whether the State offered sufficient evidence to establish a nexus between the weapon and Middlebrooks' assault charges and whether there was sufficient evidence to show that the weapon was readily available.

The admitted video of the May 5 assaults is not particularly helpful, as it is a cellphone video recording of another video playing on a computer monitor, making it difficult to make out what, if anything, Middlebrooks is doing after officers take him to the ground. However, three of the officers involved in the May 5 altercation provided testimony sufficient to establish Middlebrooks' intent to use the firearm in the commission of his assaults.

Officer Moffitt testified that after he took Middlebrooks to the ground, he saw Middlebrooks reaching for his waistband area, and that that caused him concern because in his

training and experience, "suspects commonly carry firearms . . . in their waistband." 3 VRP (July 11, 2023) at 464-65. Officer Moffitt also testified that Middlebrooks continued to reach for his waistband and that it took all of Officer Moffitt's strength to hold Middlebrooks' left arm back.

Officer Teclemariam testified that Middlebrooks kept reaching for his waist even after the officers took him to the ground and flipped him onto his stomach. Officer Teclemariam also testified that after they handcuffed Middlebrooks, he picked up a bag under Middlebrooks' feet and in the bag was a loaded firearm that could be fired by "just pull[ing] the trigger." 3 VRP (July 11, 2023) at 531. Officer Teclemariam testified that all Middlebrooks would have had to do to fire the weapon was "unzip the bag and then just grab the gun." 3 VRP (July 11, 2023) at 531.

Officer Eames testified that when she observed Middlebrooks fighting with Officers Moffitt and Teclemariam, they had Middlebrooks on his stomach and were trying to control his arms, which were tucked under his body.

The testimony of Officers Moffitt, Teclemariam, and Eames demonstrates Middlebrooks' intent or willingness to use the firearm during his assault of the officers and that a firearm was readily available to him. *Houston-Sconiers*, 188 Wn.2d at 17. And the evidence is sufficient to demonstrate a nexus between the firearm and crimes charged. *Brown*, 162 Wn.2d at 434. Thus, there was sufficient evidence to support the firearm sentencing enhancements on the assault charges.

## CONCLUSION

Any error in joining the charges and in allowing identification testimony was harmless. Also, sufficient evidence supports the firearm sentencing enhancement. Accordingly, we affirm.

18

No. 58646-1-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, P.J.

We concur:

Glasgow, J.

Price, J.